**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 11 2003**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

M. LOUISE CANNON and ALLAN
ROBERT CANNON, Individuals,

      Plaintiffs-Appellees/Cross-
      Appellants,

v.

UNITED STATES OF AMERICA,

      Defendant-Appellant/Cross-
      Appellee.

Nos. 02-4059, 02-4066

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D.C. No. 98-CV-882-J)**

---

Ryan M. Harris (Anthony L. Rampton with him on the briefs), of Jones, Waldo, Holbrook & McDonough, Salt Lake City, Utah, for Plaintiffs-Appellees/Cross-Appellants.

Gay Elizabeth Kang, Trial Attorney, Torts Branch, Civil Division (Paul M. Warner, United States Attorney, Daniel D. Price, Assistant United States Attorney, Robert D. McCallum, Jr., Assistant Attorney General, J. Patrick Glynn, Director, Torts Branch, Civil Division, Joann J. Bordeaux, Deputy Director, Torts Branch, Civil Division, and David S. Fishback, Assistant Director, Torts Branch, Civil Division, with her on the brief), United States Department of Justice, Washington D.C., for Defendant-Appellant/Cross-Appellee.

---

Before **LUCERO**, **BALDOCK**, and **O'BRIEN**, Circuit Judges.

---

**BALDOCK**, Circuit Judge.

_____

The Federal Tort Claims Act (FTCA) waives the sovereign immunity of the United States for certain tort claims "accruing on or after January 1, 1945 . . . under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act . . . occurred." 28 U.S.C. § 1346(b). Under the FTCA's limited waiver of sovereign immunity, "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues . . . ." Id. § 2401(b). This Government appeal presents the question of whether § 2401(b) bars Plaintiffs' FTCA claim against the United States for damages to mining property caused by World War II weapons testing. While not condoning the Government's abysmal failure over the past half-century to clean up the test site, we hold § 2401(b) bars Plaintiffs' FTCA claim for money damages. Accordingly, the district court erred in entering judgment for Plaintiffs. We reverse and remand with directions to dismiss the complaint for lack of subject matter jurisdiction.

I.

In 1945 near the end of World War II, the United States Army conducted conventional high explosive, chemical, and incendiary weapons testing on Jesse F. Cannon's property located in the remote Dugway Mining District of Tooele County,

2

Utah. The property is a part of the "Yellow Jacket Area," and sits adjacent to the

Army's Dugway Proving Ground (DPG). The property consists of over 1,416 acres

encompassing 86.5 patented mining claims. The purpose of the Army's testing

was to explore means of battling Japanese forces entrenched in caves in the Pacific

Islands. Prior to testing, Cannon secured a written agreement from the Army in

which Cannon agreed to the Army's use of his property in exchange for the Army's

promise to "leave the property of the owner in as good condition as it is on the date

of the government's entry."[1]

The Army failed to keep its promise to clean up Cannon's property. In September

1945, Cannon reentered his property and found the testing had damaged his mines.[2]

That same month, Cannon successfully filed an administrative claim against the

Government to compensate him for cessation of mining operations "due to the use

of toxic chemical agents and explosive munitions." The Government paid Cannon

---

[1] During the testing known as "Project Sphinx," the Army, according to the record in this case, dropped over 3,000 rounds of ammunition containing either chemical or incendiary weapons. Over twenty-three tons of chemical weapons were dropped. The incendiary weapons tested included butane, gasoline, and napalm. The chemical weapons tested included the choking agent phosgene, the blood agent hydrogen cyanide, and the blistering agent mustard. The Army also dropped conventional type bombs filled with high explosive materials.

[2] Cannon walked the property with the Army Post Engineer and an Army Claims Officer. The site visit report states the purpose of the walk was "to observe damage that may have resulted from CWS [Chemical Warfare Services] operations in the area." The report further states the "entire area is liberally covered with shell, rocket, and bomb fragments," and notes that "[j]ust outside [a] cabin are 10 Butane filled dud bombs."

$755.48 on his first claim. In October 1945, Cannon filed a second successful administrative claim for destruction of mine shaft timbering due to "the use of toxic chemical agents, incendiaries, and explosive munitions." The Government paid Cannon $2,064 on his second claim. Nearly five years later in July 1950, Cannon submitted a third claim against the Government. To support his third claim, Cannon submitted a statement which read in part:

> I realize that when I accepted this $2064 payment from the Government it constituted full satisfaction for the claim against the Government for damages done to the Yellow Jacket Mine. However, I did not believe at that time that the chemical agents used by the Army would remain in the workings and make it impossible for me to ever operate the mine again without some sort of decontamination of the underground workings. . . . It is now five years since the Army dropped their poison gas bombs on the mine and I am certain that there is still a concentration of poison gas present in the mine that would preclude its operation by anybody without some sort of decontamination. I do not know if the gas is present in dangerous quantities or even if the odorous material present is a poison gas but I do know that the miners who have looked at the property with a view of taking a lease have shied away when they learned of the Army's use of the mine. . . . I believe[] that it would require about $5000 to put the mine in condition to be worked again.

In 1951, the Government denied Cannon's third claim without further complaint.

Jesse F. Cannon's son, Dr. J. Floyd Cannon, acquired the property in 1954 with knowledge of ordnance contamination on the property. Around 1957, Dr. Cannon conveyed a 75% interest in the property to his four children, retaining a 25% interest. Over the next few years, Dr. Cannon made numerous trips onto the property and each time found exploded and unexploded surface bombs and weapon fragments. Dr. Cannon

4

reportedly requested the DPG to clean up the property on multiple occasions, but never filed any claim or grievance against the Government.

In the late 1970s, the Government conducted a comprehensive study of contaminated lands at the DPG. In 1979, the Government issued a detailed report of its study. United States Army Toxic and Hazardous Materials Agency, Report No. 140, Installation Assessment of Dugway Proving Ground (1979). The report noted testing had occurred in the Yellow Jacket Area adjacent to DPG: "The Yellow Jacket Area . . . was used in the 1940's . . . to test munitions containing chemical agents, incendiaries, and high explosives. Complete documentation is lacking in this area." The report recommended that (1) "DPG better define the hazards and problems of UXO [unexploded ordnance] at . . . the Yellow Jacket Area," and (2) "action by DPG be expedited to better define the extent of the test site[] within the . . . Yellow Jacket Area[], and to bring [this] area[] under proper control." Dr. Cannon apparently was not aware of the report upon his death in 1980.

In 1980, Dr. Cannon's four children, Mary Alice, Margaret Louise, Allan Robert, and Douglas F. Cannon, inherited the remainder of the property. In 1988, the Government issued an update to its 1979 report. United States Army Toxic and Hazardous Materials Agency, Update of the Initial Installation Assessment of Dugway Proving Ground (1988). Regarding the Yellow Jacket Area, the unclassified report stated the area–

was identified in the [1979 report] as a test area for various unidentified chemical agents, fire bombs, rockets, and smoke and mortar rounds during the 1940s . . . . Discussion with long-time employees indicate that the surface UXOs [unexploded ordnance] and empty containers were cleared from the area but some subsurface UXOs could exist. . . . Due to an absence of records, DPG has not been able to better define the activities or exact locations where they occurred in the Yellow Jacket Area. The installation is to withdraw this area from . . . the Public Domain, and permanently add it to the current DPG land holdings because it is potentially contaminated from past Army activities . . . .

The report reiterated the Yellow Jacket Area was "potentially contaminated with hazardous materials," and was subject to an ongoing "environmental assessment."

On July 13, 1994, the United States Army Corp of Engineers (COE), in cooperation with the DPG, notified the Cannons that the Government was conducting a "geophysical survey of property known as the Yellow Jacket Mines." The purpose of the survey was "to determine whether . . . these lands have been impacted by unexploded ordnance." The letter provided a contact if the Cannons "wish[ed] to discuss the project in greater detail." Margaret Louise and Allan Robert Cannon signed access agreements on July 22 and August 28, respectively.[3] The agreements authorized the Government to inspect the Cannons' property "under the remedial design phase of the Defense Environmental Restoration Program for Formerly Used Defense Sites" (FUDS) to "[d]etermine [the] presence or absence of Ordnance and

_____

   [3] As a result of a conveyance from Mary Alice, Margaret Louise today owns a 50% interest in the property. The two Cannon brothers, Douglas F. and Allan Robert continue to own a 25% interest each. Margaret Louise and Allan Robert are Co-Plaintiffs in this case. Douglas F. Cannon is not a party to this litigation.

6

Explosive Wastes (OEW) contamination."[4]

On August 23, 1994, the COE issued a press release announcing "an informal Availability Session" to be held the following week on August 30, 1994, at the Tooele County Courthouse. The release stated the COE was undertaking an "Engineering Evaluation/Cost Analysis (EE/CA)" to determine risks associated with former defense sites including the Yellow Jacket Area.[5] The release explained that testing in and around the area during the 1940s involved "toxic, smoke, and flame agents in bombs, mortar and artillery shells, rockets, and . . . light case tanks. Gasoline, butane, the non-persistent agents Phosgene, Hydrogen Cyanide, and Cyanogen Chloride, and the persistent agent Mustard Gas were used in the tests." The release further explained that once testing ended, "the cleanup process involved a sweep of the areas to clear remaining surface ordnance." The release specifically noted the possibility that "some soil contamination and subsurface OEW may still exist."

Margaret Louise Cannon attended the public "Session" and obtained three "Fact Sheets." One of those sheets, entitled "Yellow Jacket Ranges," reiterated much

---

[4] As part of the restoration program, the COE conducted a risk assessment of the Yellow Jacket Area in 1993. The unreleased report noted the "potentially catastrophic nature of an encounter" with unexploded munitions in the area. This report apparently spawned the Government's "survey."

[5] According to the release, "[i]nvestigation of FUDS takes place under the Defense Environmental Restoration Program (DERP) which is regulated by the Comprehensive Environmental Response, Restoration, Compensation, and Liability Act (CERCLA) of 1980 as amended by the Superfund Amendment and Reauthorization Act (SARA) of 1986."

of the information contained in the press release. A portion of the fact sheet labeled "Potential Hazards" read:

> A study by the [COE] in 1993 . . . reported that it is highly probable that these mine areas are contaminated with hazardous ordnance and explosive waste (OEW). It is suspected that there is subsurface OEW throughout the area which may come to the surface through erosion, frost heaving, intrusive work such as digging, or recreational land use. Additionally, rounds that may have fallen short or long of intended targets could also present public hazards.

In the fall of 1994, the COE conducted numerous interviews with community members to assess the public's level of concern and informational needs regarding the EE/CA project. On December 6, 1994, Margaret Louise Cannon participated in a telephone interview. The interviewer's contemporaneous notes indicate Margaret Louise obtained knowledge about the Government's weapons testing program in the Yellow Jacket Area from her father Dr. J. Floyd Cannon. According to the notes, Dr. Cannon asked DPG four to six times to clean up its mess and was "treated horribly." Dr. Cannon witnessed unexploded ordnance "all over" the property and was "livid over" the Army's testing. During the interview, Margaret Louise reportedly expressed much distrust towards the Government and its apparent willingness to address the problem. She stated private land owners affected by the testing were "probably going to have to hire an attorney."

In August 1996, the Government released an EE/CA draft report documenting the survey results. United States Army Corps of Engineers Engineering and Support

8

Center, Draft: Formerly Used Defense Site Engineering Evaluation/Cost Analysis Report: Yellow Jacket Ranges, Site No. J08UT109800, Tooele County, Utah (1996). The draft report indicated the Cannons' property was in fact highly contaminated with ordnance. A limited search of the property based on "search grids" revealed "subsurface geophysical anomalies."[6] The report stated "[n]o assumption can be made as to what percentage of subsurface geophysical anomalies are actually CWM [chemical weapons], UXO, or UXO related items." The limited search also revealed "a number of UXO and UXO-related items . . . on the ground surface."[7] The report concluded:

> The density of the geophysical anomalies and ordnance-related debris, the presence of UXO and UXO-related items on the surface, and the presence of multiple spent ordnance items imply that a relatively higher hazard exists due to UXO/CWM contamination at the Yellow Jacket Mines than at the other investigation areas.

---

[6] A government contractor conducted the geophysical survey. In conducting the survey, the contractor searched portions of only five of the Cannons' 86.5 patented mining claims. Within those five claims, the contractor searched specified 100' by 200' "search grids." Twenty-eight of forty grids in the Yellow Jacket Area were located on the Cannons' property.

[7] Among the "live" munitions found on the surface were (1) a 4.2-inch mortar round filled with high explosives; (2) four partially intact to intact burster tubes and fuses from M47 100-pound chemical-filled bombs containing remnant amounts of high explosives; (3) four partially intact to intact burster tubes and fuses from 7.2-inch chemical rockets, some of which were still inside burst warhead casings; and (4) three partially intact burster tubes from 7.2-inch chemical rockets containing varying amounts of high explosives. The report noted these items provided "[n]o evidence of intact chemical rounds," and were subsequently "demilitarized." Numerous burst bomb casings, spray/drop tanks, 4.2-inch mortar baseplates, and spent rocket motors from 7.2-inch rockets also were present in the area.

9

Due to cost concerns, the EE/CA draft report rejected a proposed clean-up of the site. The report estimated "Full-Scale Removal" of munitions and related debris in the Yellow Jacket Area would cost approximately $12.3 million. The report recommended an alternative plan which included (1) acquisition of private mine claims and property titles; (2) fencing and posting signs; (3) limited removal action; and (4) mine sealing. To date, the only action the Government has taken associated with the draft report's conclusions and recommendations is to defend this lawsuit. In fact, "due to funding constraints," the Government has yet to issue a final version of the EE/CA Report.[8]

## II.

On April 7, 1998, Plaintiffs Margaret Louise and Allan Robert Cannon presented the Army a damage claim for injury to their respective mining interests. On December 11, 1998, the Cannons filed this lawsuit under the FTCA asking for "not less than $8 million." Shortly thereafter, the Army summarily denied the Cannons' administrative claim. See 28 U.S.C. § 2675(a).[9] The Government submitted a motion to dismiss the Cannons' suit for lack of subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(1).

_____

[8] Despite the contamination, the Cannons' mining interests in the affected area have not been wholly unproductive. The district court found that between 1969 and 1993 the Cannons earned $246,000 from mining leases in the area.

[9] The Cannons properly filed this action prior to disposition of their administrative claim pursuant to § 2675(a). That section provides "[t]he failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim for purposes of this section."

The Government based its motion on, among other things, the FTCA's two-year statute

of limitations, 28 U.S.C. § 2401(b), and the doctrine of sovereign immunity.[10]  The

Cannons argued the discovery rule tolled the limitations period until August 1996 when

the EE/CA draft report issued.  Because the Cannons filed their administrative claim

in April 1998, their suit ostensibly was timely.

After hearing, the district court denied the Government's motion to dismiss.

Apparently rejecting application of the discovery rule, the court summarily concluded

the contamination from the Army's weapons testing constituted a "continuing trespass

and nuisance" on the Cannons' mining interests.  The court made no underlying factual

findings to support its legal conclusion.  Following a bench trial and entry of judgment

for the Cannons, the Government appealed.[11]  We exercise jurisdiction under 28 U.S.C.

---

[10]  The FTCA constitutes a limited waiver of the Government's sovereign
immunity.  See Smith v. United States, 507 U.S. 197, 201 (1993).  If a claimant
fails to satisfy the FTCA's timing requirements set forth in § 2401(b), the district
court lacks subject matter jurisdiction to proceed under the FTCA.  See Dahl v.
United States, 319 F.3d 1226, 1228 (10th Cir. 2003).

[11]  Following denial of the Government's motion to dismiss, the Cannons
moved for partial summary judgment on the question of liability.  The district court
granted the Cannons' motion and set the matter for trial on the question of damages.
The Government filed a motion in limine to exclude evidence of remediation costs
as the measure of damages.  Over the Cannons' objection, the court granted the
Government's motion.  The district court ruled that dimunition in value was the proper
measure of damages.  The court concluded the presence of military ordnance reduced the
value of the property from $176.26 per acre to $25.00 per acre, and awarded the Cannons
$160,936.85 in damages based upon their 75% ownership interest.  See supra n.3.  On
appeal, the Government also challenges the amount of the damage award.  The Cannons
have cross-appealed, challenging the district court's measure of damages.  Because we
(continued...)

11

§ 1291. We review de novo the district court's legal conclusion. See Dahl v. United States, 319 F.3d 1226, 1228-29 (10th Cir. 2003).

On appeal, the Government contends the two-year limitations period began to run no later than August 30, 1994, the date on which Margaret Louise Cannon attended the "Public Availability Session" and obtained a fact sheet indicating a high probability the Cannon property was contaminated with hazardous ordnance and explosive waste. The Cannons counter with the proposition that the discovery rule tolled the limitations period until August 1996 when the Government released the EE/CA draft report. According to the Cannons, "[t]heir claim did not accrue until release of the Government's 1996 EE/CA report, which finally and conclusively determined the Cannon property had been severely contaminated by U.S. Army weapons tests." In the alternative, the Cannons adopt the district court's rationale. They assert the Government's contamination constitutes a continuing trespass and nuisance on their property. Under this theory, the Cannons argue their FTCA claim continues to accrue until the Government ceases its tortious conduct by decontaminating their property.

III.

An FTCA claim against the Federal Government must be "presented in writing

---

[11](...continued)
conclude the Cannons' FTCA claims are time-barred, we need not consider the question of damages.

12

to the appropriate Federal agency within two years after such claim accrues."[12]  Federal law governs the point at which a claim accrues under the FTCA.  Hoery v. United States, 324 F.3d 1220, 1222 (10th Cir. 2003).  Neither the FTCA nor its legislative history, however, speaks to when a "claim accrues."  In making that determination, we keep "in mind that the Act waives the immunity of the United States and that in construing the statute of limitations, which is a condition of that waiver, we should not take it upon ourselves to extend the waiver beyond that which Congress intended."  United States v. Kubrick, 444 U.S. 111, 117-18 (1979).  Nor should we seek to narrow that waiver.  Rather, we seek to interpret § 2401(b) consistent with congressional intent.

## A.

In the Tenth Circuit, the general rule for accrual of an FTCA claim outside the medical malpractice context is the "injury-occurrence rule."  An FTCA tort claim accrues on the date of the injury's occurrence.  Plaza Speedway Inc. v. United States, 311 F.3d 1262, 1267-68 (10th Cir. 2002).  A different rule, the discovery rule, applies only in the "exceptional case" where a reasonably diligent plaintiff could not immediately know of the injury and its cause.  Id. at 1268.  In that instance, an FTCA claim accrues

---

[12]  Section 2401(b) reads in its entirety:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

28 U.S.C. § 2401(b).

at the time when a reasonably diligent plaintiff would have known of the injury and its cause. Id. at 1267. For FTCA purposes, "[a] claimant is aware of the injury once . . . apprised of the general nature of the injury. Lack of knowledge of the injury's permanence, extent, and ramifications does not toll the statute." Gustavson v. United States, 655 F.2d 1034, 1036 (10th Cir. 1981) (medical malpractice claim); see also Robbins v. United States, 624 F.2d 971, 973 (10th Cir. 1980) (uncertainty as to the "ultimate damage" does not toll § 2401(b)). In Dahl, 319 F.3d at 1229, we recently explained–

> the discovery rule should be applied only when the injury is "unknowable by its very essence, i.e., its existence at the critical moment simply cannot be ascertained. The fact that a plaintiff happens to be ignorant of a potential claim, whether because the plaintiff was not diligent in monitoring its land or because observing the taking would exact a hardship on plaintiff in terms of money, manpower, time and effort, is not enough to" justify application of the discovery rule.

(quoting Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399, 407 (1994)) (internal citations and brackets omitted).

After Dahl, the Government's argument that this is not an "exceptional case" calling for application of the discovery rule is forceful.[13] Any suggestion that the

---

[13] In Dahl, landowners filed an FTCA claim alleging the Government wrongfully destroyed a mineral ore stockpile on their mining claims. The stockpile contained several tons of ore. The Bureau of Land Management (BLM) "reclaimed" the stockpile in July 1997. None of the owners visited the reclamation site until June 1998. In May 2000, the owners filed an administrative claim with the BLM. Holding the action barred, we squarely rejected application of the discovery rule:

(continued...)

14

nature of the Cannons' injury or its cause at the outset was "unknowable by its very essence," seems doubtful.[14] But we need not apply the "injury-occurrence rule" to resolve this case. Our decision in Plaza Speedway, 311 F.3d at 1262, compels us to conclude that the discovery rule, even if applicable, did not toll the two-year limitations period beyond the date of the "Availability Session" in August 1994.

In Plaza Speedway, we applied the discovery rule to an FTCA toxic tort claim. From 1960 through 1984, the Army, on property adjacent to the subject property, trained firefighters by pouring flammable liquids into a shallow fire pit, igniting the liquids, and

_____

[13](...continued)
We see no reason to depart from the general rule in this case. The destruction of a quarter-mile wide, 30-foot high stockpile of mineral ore is a manifest injury, whose cause could hardly have been a mystery. The injury was neither inherently unknowable, nor latent. Plaintiffs could have discovered what had happened at any time after the leveling. To be sure, the area is somewhat remote, about 100 miles from Dahl's laboratory. But it is fair to charge a property owner with knowledge of what happens on his land, at least when the occurrence would be obvious upon inspection.
Dahl, 319 F.3d at 1229 (internal citations, quotations, and brackets omitted).

[14] Nothing in the record suggests the Cannons' grandfather and predecessor in title could not have ascertained the nature of his injury and its cause following cessation of the Army's weapons testing near the end of World War II. Rather, the record reflects Jesse F. Cannon did ascertain the nature of his injury and its cause. Shortly after testing ended, Cannon walked the property which was "liberally covered with shell, rocket, and bomb fragments." See supra n.2. He submitted three administrative claims to the Army. In his second claim, Cannon referred to the Army's "use of toxic chemical agents, incendiaries, and explosive munitions." In his third claim, Cannon expressed the belief "that the chemical agents used by the Army . . . remain in the workings and make it impossible for me to ever operate the mines again without some sort of decontamination." See supra at 3-4 (emphasis added).

extinguishing the flames. When claimants purchased the adjacent property in February 1989, they "were aware that the United States Army had conducted numerous operations at [the airfield] in a close proximity to [the] area whereby jet fuel, solvents and various chemicals were employed in a number of exercise activities over the years." Id. at 1265. Nonetheless, the new owners did not seek an environmental assessment of their property. In August 1993, an environmental geologist with the State of Kansas phoned the owners to discuss chemical contamination on their property. The geologist followed up with an October 1993 letter informing the owners of hazardous substances on their property. In February 1995, the owners received formal notice from the State that the Army's nearby military operations could be the source of the contamination. The owners filed an administrative claim with the Army for property contamination in October 1995.

We held the discovery rule tolled the running of the limitations period only until August 1993 when the State's environmental geologist informally phoned the owners to discuss the contamination on their property. Because the owners knew at that time of the Army's prior use of chemical substances on the adjacent property, they had adequate knowledge of their injury and its cause to warrant further investigation. Thus, the owners' October 1995 administrative claim was untimely. Section 2401(b) and the doctrine of sovereign immunity prohibited the district court from exercising jurisdiction over the matter. Id. at 1270-71.

We reach a similar conclusion in this case. In a December 1994 government interview, Margaret Louise Cannon acknowledged she learned of the weapons testing on the property from her father, Dr. J. Floyd Cannon, who died in 1980. She indicated her father witnessed unexploded ordnance "all over" the property and "was livid" over the testing. She further indicated Dr. Cannon repeatedly asked the DPG to clean up the property. See supra at 8. In July 1994, the Army sent the Cannons a letter of concern regarding ordnance contamination on their property. In August 1994, the Army held a public gathering which further informed the Cannons about possible ordnance contamination on their property and the ongoing environmental assessment. One of the fact sheets which Margaret Louise Cannon procured at the gathering "reported that it is highly probable that these mine areas are contaminated with hazardous ordnance and explosive waste." She acknowledged the Cannons' likely need for an attorney to address the situation during her December 1994 interview. See supra at 6-8.[15]

The Cannons certainly were not "ignorant of a potential claim" against the Government in August 1994. Dahl, 319 F.3d at 1229. At that point (if not before), the Cannons possessed adequate information about their injury and its cause to commence running of the limitations period. Yet they failed to seek counsel or initiate any investigation into the matter. Rather, the Cannons waited until

---

[15] The Cannons do not suggest that Allan Robert's knowledge of the situation was any different than Margaret Louise's knowledge. Presumably, she shared the information and knowledge she obtained with her brother.

17

the Government informed them of the extent of their injury to file an administrative claim, and now assert they were unaware of "long-term" damage to their property prior to release of the EE/CA draft report.

Notably, much of the damage which the Government's study detected was surface damage due to unexploded ordnance. See supra n.7. A surface investigation of their mining property would have revealed the likely extent of the Cannons' property damage long before the Government's study did. As we stated over two decades ago in Gustavson, 655 F.2d at 1036, and now reaffirm: "Lack of knowledge of the injury's permanence, extent, and ramifications does not toll [§ 2401(b)]."

The Supreme Court's decision in Kubrick, 444 U.S. at 111, further supports our conclusion. In that FTCA malpractice case, the Court rejected the proposition that once aware of an injury and its cause, a plaintiff "need not initiate a prompt inquiry and would be free to sue any time within two years from the time he receives or perhaps forms for himself a reasonable opinion that he has been wronged." Id. at 118. The Cannons, armed with notice of their injury and its cause, could have protected themselves months if not years before release of the EE/CA draft report. Under the undisputed facts of this case, the Cannons undoubtedly had notice of the general nature of their injury and its cause no later than August 1994. Hence, we refuse to postpone accrual of their FTCA claim until the Government informed them as to the extent of their damage in August 1996. Binding precedent will not permit us to "undermine

18

the purpose of the limitations statute, which is to require the reasonably diligent presentation of tort claims against the Government." Id. at 123.

B.

The Cannons seek to avoid the effect of § 2401(b) and case law construing it by characterizing the Government's tortious conduct in this case as continuous. As we recently explained: "For continuing torts, . . . [an FTCA] claim continues to accrue as long as the tortious conduct continues, although the plaintiff's recovery is limited by the statute of limitations to the two-year period dating back from when the plaintiff's complaint was filed." Hoery, 324 F.3d at 1222. Under their continuing tort theory, the Cannons contend the presence of the Government's unexploded ordnance and chemical contamination on their mining interests constitutes ongoing tortious misconduct which accrues repeatedly.

Under the FTCA, the Government is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and "in accordance with the law of the place where the act . . . occurred." Id. § 1346(b)(1). Because the FTCA mandates application of state law to resolve questions of substantive liability, the question of whether a tort is characterized as permanent or continuous depends upon how state law would characterize the tort. Hoery, 324 F.3d at 1222.[16]

---

[16] In Hoery, 324 F.3d at 1223-24, we rejected the Government's argument that a continuing tort theory in FTCA cases would thwart Congress' intent to establish a

(continued...)

19

Because the Cannons' property is located in Utah, we look to Utah state law to characterize the nature of the tort in this case. Compare infra n.18.

To determine whether a trespass or nuisance is permanent or continuous, Utah state courts "look solely to the act constituting the trespass [or nuisance], and not to the harm resulting from the act." Breiggar Prop., L.C., v. H.E. Davis & Sons, 52 P.3d 1133, 1135 (Utah 2002) (emphasis in original) (clarifying Walker Drug Co., Inc. v. La Sal Oil Co., 902 P.2d 1229 (Utah 1995) (Walker I)). In Breiggar, a landowner sued a state transportation department contractor for trespass after the contractor left debris on his property. The Utah Supreme Court characterized the tort as permanent, and concluded the limitations period began to run on the date the contractor dumped the debris on the property. The court viewed as irrelevant "[t]he fact that the pile of debris continued to remain on Breiggar's property." Id. at 1136. "Whether the trespass or nuisance is continuous or permanent is a different question from whether the resulting

---

[16](...continued)
uniform statute of limitations for tort claims by effectively extending § 2401(b)'s limitations period. We explained "[c]ongressional intent that stale claims be avoided is not frustrated when, under applicable state law, the wrongful conduct continues." Id. at 1224. Moreover, "the two-year statute of limitations does run uniformly on a continuing tort because damages are recoverable for only the two years prior to the time the plaintiff files the required administrative complaint." Id. The language of the FTCA and Hoery's reasoning undoubtedly dictate the application of state law in this case to characterize the nature of the Government's tort. But cf. Toussie v. United States, 397 U.S. 112, 115 (1970) (noting in the criminal context that "the tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent; the latter, for all practical purposes, extends the statute beyond its stated term") (internal quotations and brackets omitted).

20

injury to the land or to the possessor's interests in the land is temporary or permanent." Walker Drug Co., Inc. v. La Sal Oil Co., 972 P.2d 1238, 1246 n.9 (Utah 1998) (Walker II)). Under Utah law, a continuous tort requires "recurring tortious . . . conduct and is not established by the continuation of harm caused by previous but terminated tortious . . . conduct." Breiggar, 52 P.3d at 1136 (emphasis in original) (internal quotations omitted).

In this case, the Army discontinued its conduct, i.e., dropping ordnance, on the Cannons' property in 1945, leaving a "debris field" of exploded and unexploded ordnance and chemical contamination on and under the surface. The harm for which the Cannons now seek to recover damages is the exact same harm which their grandfather, Jesse F. Cannon, incurred in 1945 and which their father, Dr. J. Floyd Cannon, "inherited" in 1954. Despite the Cannons' contrary assertion, the fact that dangerous ordnance and contamination remain on the Cannons' property is irrelevant in characterizing the nature of the Government's tort under Utah law. The harm that existed in 1945 is the harm that exists now. The Cannons do not suggest and nothing in the record supports the proposition that contamination or ordnance continues to enter or migrate onto the Cannons' property. Compare Hoery, 324 F.3d at 1221 (recognizing allegation that chemical contamination continued to migrate onto plaintiff's property

21

and enter groundwater and soil).[17]  The Government's failure to remove ordnance and contamination from the Cannons' property does not constitute a continuing trespass or nuisance under Utah law.[18]  Accordingly, a continuing trespass or nuisance theory provides the Cannons no relief from §2401(b)'s two-year limitations period.

## IV.

The result the law dictates in this case does not diminish the harm to the Cannons' property which has persisted over half a century.  Courts generally "should regard the plea of limitations as a meritorious defense, in itself serving a public interest."  Kubrick, 444 U.S. at 117 (internal quotations omitted).  Nevertheless, "[e]very statute of limitations . . . may permit a rogue to escape."  Toussie v. United States, 397 U.S. 112, 123 (1970) (internal quotations omitted).  Prior to testing, the United States expressly promised the Cannons' grandfather that it would "leave the property of the owner in as

---

[17]  Although Utah law provides no definite answer, detonation of ordnance presently on the Cannons' property causing additional harm might very well be characterized as a new instance of tortious conduct.  The Government acknowledges the situation would change significantly if unexploded ordnance on the Cannons' property accidently detonated causing personal or additional property damage.  We need not reach this question, however, as the record before us does not indicate that any such detonations have occurred.

[18]  As Hoery illustrates, Colorado law would dictate a different result in this case.  In Hoery, we certified to the Colorado Supreme Court the question of whether the ongoing presence of toxic chemicals on plaintiff's property constitutes a continuing trespass or nuisance under Colorado law.  324 F.3d at 1222-23.  The Colorado Supreme Court held that "Colorado law recognizes the concepts of continuing trespass and nuisance for those property invasions where a defendant fails to stop or remove continuing, harmful physical conditions that are wrongfully placed on a plaintiff's land."  Hoery v. United States, 64 P.3d 214, 220 (Colo. 2003) (emphasis added).

22

good condition as it is on the date of the government's entry."  Fifty-eight years later,

the Government has yet to fulfill its contractual obligation to the Cannon family.

They are still waiting.[19]

The United States Government has yet fully to recognize and appreciate Jesse

F. Cannon's contribution to National Security during World War II.  The Government

should have lived up to its obligations long ago.  Unfortunately, applicable law rendered

the district court powerless to grant the Cannons the monetary relief to which they

undoubtedly are entitled absent decontamination.  The Cannons' remedy at this

stage is political, however, not legal.[20]


REVERSED and REMANDED with instructions to dismiss this action for

want of subject matter jurisdiction.

---

[19] We share the frustration the district court expressed over the situation.  The court specifically directed the Government to bring to the pre-trial conference an Army official prepared with authority to state a specific time by which the Plaintiffs' property will be cleaned-up.  After hearing from a representative of the COE, the court found that if several variables including Congressional funding remain as they currently stand, the clean-up could begin in 2007.

[20] The FTCA provides only for an award of monetary damages.  We express no opinion on the possible availability of injunctive relief to remedy the situation.