**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 26, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

F. DOUGLAS CANNON;
MARGARET LOUISE CANNON;
ALLAN ROBERT CANNON,

      Plaintiffs-Appellants,

v.

ROBERT M. GATES, Secretary,
United States Department of Defense;
UNITED STATES DEPARTMENT
OF DEFENSE; UNITED STATES
DEPARTMENT OF THE ARMY;
UNITED STATES OF AMERICA,

      Defendants-Appellees.

No. 07-4107

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:05-CV-00922-DB)**

---

Ronald Walter Opsahl (Joshua D. McMahon and William Perry Pendley with him on the brief), Mountain States Legal Foundation, Lakewood, Colorado, for Plaintiffs-Appellants.

Stacey W. Person, U.S. Department of Justice, Environment and Natural Resources Division (Ronald J. Tenpas, Acting Assistant Attorney General, Daniel Pinkston and Elizabeth A. Peterson, U.S. Department of Justice, Environment and Natural Resources Division, and Tracy Gruis, of Counsel, Office of the Chief Counsel, U.S. Army Corps of Engineers, with her on the brief), Washington, D.C., for Defendants-Appellees.

Before **LUCERO**, **HOLLOWAY**, and **EBEL**, Circuit Judges.

**EBEL**, Circuit Judge.

Plaintiffs-Appellants F. Douglas Cannon, Allan Robert Cannon, and Margaret Louise Cannon (the "Cannons") brought suit against the Defendants-Appellees claiming two violations of the Solid Waste Disposal Act and one violation of the Administrative Procedures Act. The district court dismissed the case for lack of subject matter jurisdiction pursuant to the jurisdiction-stripping provision at 42 U.S.C. § 9613(h). We conclude that the district court properly applied § 9613(h) because the Cannons' suit constitutes a challenge to the Government's selected removal action, and therefore AFFIRM the dismissal.

**I.**

Jesse Fox Cannon owned over 1,416 acres of land in Tooele County, Utah. Cannon's land was adjacent to the Army's Dugway Proving Grounds.[1] In 1945, Cannon entered into a six-month lease with the United States War Department, which provided that, in return for one dollar, Cannon would permit the Government to enter onto his land "in order to survey and carry out such other exploratory work as may be necessary in connection with the property; to erect

---

[1] The Cannon property is located within the "Yellow Jacket Mines area," which is immediately adjacent to the Proving Grounds.

buildings and any other type of improvement; and to perform construction work of any nature." The Government agreed that, at the expiration of the lease, it would "leave the property of the owner in as good condition as it is on the date of the government's entry."

Government officials then entered onto Cannon's land to conduct Project Sphinx, which was designed to test "means of battling Japanese forces entrenched in caves in the Pacific Islands." Cannon v. United States, 338 F.3d 1183, 1184 (10th Cir. 2003). As part of that testing, the Government used incendiary weapons, including aviation fuel, butane, gasoline, napalm, PT jell, and napalm-gas mixtures. The Government also used chemical weapons, such as phosgene, hydrogen cyanide, mustard gas, and defoliants. Finally, the Government dropped conventional bombs on Cannon's property, including 12,000-pound Fall Boy bombs and Tiny Tim rockets. In all, the Government used at least 3,000 rounds of ammunition and twenty-three tons of chemical weapons in the tests it conducted on Cannon's property. See Cannon, 338 F.3d at 1185 n.1.

After completing its tests, "[t]he Army failed to keep its promise to clean up Cannon's property." Cannon, 338 F.3d at 1185. When Cannon reentered the land in September 1945, "the entire area [was] liberally covered with shell, rocket, and bomb fragments . . . ." Id. at 1185 & n.2 (internal quotation marks omitted). In September and October 1945, Cannon filed two administrative

claims with the Government. For the first claim, the Government paid Cannon $755.48 for disrupting mining activities, and for the second, the Government paid Cannon $2,064 for the destruction of mine shaft timbering. See id. at 1185. Cannon then filed a third claim with the Government in 1950, asserting that he had been unable to lease his mines because they were still filled with what appeared to be poisonous gas. See id. The Government denied that claim. See id.

Over the years, Cannon's son, Dr. J. Floyd Cannon, unsuccessfully requested that the Government clean up the property. Id. Beginning in the 1970s, the Government initiated efforts to study the contamination at the adjacent Dugway Proving Grounds, and included the Cannon property in some of these efforts. See id. at 1185-86. The Government, however, did not clean up the Cannon property at that time, and has yet to do so. Id. at 1188.

Frustrated by the slow progress in the Government's clean up efforts, two of Dr. Cannon's children, who then owned 75% of the Cannon property at issue here, sued the United States in 1998 under the Federal Tort Claims Act ("FTCA"). See id. Following a bench trial, the district court found that the Government had diminished the value of the Cannons' land from $176.26 to $25 an acre, and awarded them $160,937 in damages. See id. at 1189. This court, however, reversed that judgment and held that the statute of limitations barred the Cannons' FTCA claims. See id. at 1184, 1189-94.

In November 2005, the Cannons tried a different approach. Three of Dr. Cannon's children who currently own the land at issue—F. Douglas Cannon, Allan Robert Cannon and Margaret Louise Cannon—sued the United States, the Department of Defense, the Department of the Army, and the Secretary of Defense (collectively "the United States"), seeking to use federal environmental protection laws to force the United States to clean up the Cannons' property. To that end, the Cannons alleged two claims under the Solid Waste Disposal Act ("SWDA").[2]

The Cannons pursued their first SWDA claim under 42 U.S.C. § 6972(a)(1)(A), which permits "any person" to

> commence a civil action on his own behalf—
> (1)(A) against any person (including (a) the United States, and (b) any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment of the Constitution) who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to this chapter . . . .

42 U.S.C. § 6972(a). In support of this claim, the Cannons alleged that the United States was in violation of federal and Utah regulations applicable to generators of hazardous waste.

---

[2] The SWDA, 42 U.S.C. §§ 6901-81, amended the Resources Conservation and Recovery Act of 1976 ("RCRA"). See United States v. Colorado, 990 F.2d 1565, 1568 (10th Cir. 1993). The parties often refer to these claims as RCRA claims. Both of the Cannons' RCRA claims, asserted under 42 U.S.C. § 6972(a), are referred to as RCRA citizen suits. See Colorado, 990 F.2d at 1573 n.12, 1577-78.

The Cannons asserted their second SWDA claim under 42 U.S.C. § 6972(a)(1)(B), which provides that "any person" can commence a civil action on his own behalf

. . . .

> (B) against any person, including the United States and any other governmental instrumentality or agency, to the extent permitted by the eleventh amendment to the Constitution, and including any past or present generator, past or present transporter, or past and present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment . . . .

42 U.S.C. § 6972(a)(1)(B). In support of this claim, the Cannons alleged that the United States has contributed to conditions on their property that endanger the Cannons, other individuals mining on the property, and members of the general public who come onto the Cannons' property. Those dangers include unexploded ordnance and poisonous chemical agents.

In addition to their two SWDA claims, the Cannons also asserted a claim under the Administrative Procedures Act ("APA"), 5 U.S.C. § 706. That APA provision permits a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

The district court dismissed the Cannons' claims, holding that 42 U.S.C. § 9613(h) deprived federal courts of jurisdiction to consider those claims. Briefly

stated here, § 9613(h) deprives federal courts of jurisdiction to consider "any challenges to removal or remedial action selected" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").  In dismissing these claims, the district court concluded that the United States had already "selected" a "removal" action addressing the Cannons' property through the United States' preliminary efforts to investigate whether clean up efforts were needed.  The Cannons appeal that decision.

## II.

The district court dismissed this action at the summary-judgment stage of this litigation.  This court, therefore, will review the district court's decision <u>de novo</u>.  See <u>New Mexico v. Gen. Elec. Co.</u>, 467 F.3d 1223, 1241 (10th Cir. 2006); see also <u>Gen. Elec. Co. v. EPA</u>, 360 F.3d 188, 191 (D.C. Cir. 2004).

## A.

"Congress enacted CERCLA to provide a mechanism for the prompt and efficient cleanup of hazardous waste sites."  <u>United States v. City and County of Denver</u>, 100 F.3d 1509, 1511 (10th Cir. 1996).  "CERCLA protects the execution of a CERCLA plan *during its pendency* from lawsuits that might interfere with the expeditious cleanup effort."  <u>Gen. Elec.</u>, 467 F.3d at 1249 (internal quotation marks omitted) (quoting <u>McClellan Ecological Seepage Situation v. Perry</u>, 47 F.3d 325, 329 (9th Cir. 1995)).  CERCLA accomplishes this through 42 U.S.C. § 9613(h), which provides, in pertinent part:

> No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section 9621 of this title (relating to cleanup standards) to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under 9606(a) of this title, in any action except [if certain listed exceptions apply] . . . .

42 U.S.C. § 9613(h) (emphasis added).

"In enacting this jurisdictional bar, Congress intended to prevent time-consuming litigation which might interfere with CERCLA's overall goal of effecting the prompt cleanup of hazardous waste sites." City and County of Denver, 100 F.3d at 1514. "[T]he obvious meaning of § 9613(h) is that when a remedy has been selected, no challenge to the cleanup may occur prior to completion of the remedy." Gen. Elec., 467 F.3d at 1249 (internal quotation marks omitted). Section 9613(h), however, does not preclude actions to challenge a remedial plan after that plan has been completed. See id.

This case implicates § 9613(h) because the Cannons asserted claims under federal law—RCRA and the APA. The parties concede that none of § 9613(h)'s exceptions apply. Further, the parties agree that this case involves agency action taken under 42 U.S.C. § 9604, rather than 42 U.S.C. § 9606(a).[3] Therefore, we

---

[3]These two provisions of CERCLA, 42 U.S.C. §§ 9604 and 9606, "authorize the President and his designees to initiate cleanup operations." Pollack v. United States Dep't of Defense, 507 F.3d 522, 525 (7th Cir. 2007). Section 9604 "allows the President to undertake cleanups," while § 9606 instead "allows the President to command potentially responsible private parties to clean up their

(continued...)

must resolve two questions to determine whether § 9613(h)'s jurisdictional bar applies to this case: (i) whether the United States has "selected" a "removal or remedial action" under 42 U.S.C. § 9604; and, if so, (ii) whether the Cannons' claims present a "challenge" to that removal or remedial action.

**B.**

Our analysis of whether the United States selected a removal or remedial action "begin[s] and end[s] with the language of [§ 9613(h)] . . . ." Gen. Elec., 360 F.3d at 191; see also Colorado, 990 F.2d at 1577 (reviewing only the "plain language" of § 9613(h)). "This 'clear and unequivocal' provision is a 'blunt withdrawal of federal jurisdiction' over challenges to ongoing CERCLA removal actions . . . ." APWU v. Potter, 343 F.3d 619, 624 (2d Cir. 2003) (quoting McClellan, 47 F.3d at 328). According to its plain language, § 9613(h) strips federal court jurisdiction once the Government has begun a removal action. See, e.g., Boarhead Corp. v. Erickson, 923 F.2d 1011, 1023 (3d Cir. 1991).

In the instant case, the Government's authority to begin removal actions depends on 42 U.S.C. § 9604, which enables the Government to respond to releases, or the substantial threat of a release, of hazardous substances into the environment. Section 9604(a)(1) authorizes the President to take removal or

---

[3](...continued)
own hazardous messes." Id. Section 9606, therefore, involves abatement actions taken by the United States against responsible parties. This case does not implicate § 9606.

other remedial action which the President "deems necessary to protect the public health or welfare or the environment."[4]  Section 9604(b)(1) provides that,

> [w]henever the President is authorized to act pursuant to subsection (a) . . . <u>he may undertake such investigations, monitoring, surveys, testing and other information gathering as he may deem necessary or appropriate to identify the existence and extent of the release or threat thereof</u>, the source and nature of the hazardous substances, pollutants or contaminants involved, and the extent of danger to the public health or welfare or to the environment.  In addition, the President may undertake such planning, legal, fiscal, economic, engineering, architectural, and other studies or investigations as he may deem necessary or appropriate to plan and direct response actions, to recover the costs thereof, and to enforce the provisions of this chapter.

42 U.S.C. § 9604(b)(1) (emphasis added).

In turn, CERCLA defines removal actions as:

> The terms "remove" or "removal" mean[] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, <u>such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances</u>, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of

---

[4] Although the President has delegated most of his authority under CERCLA to the EPA, he has delegated his CERCLA authority over Department of Defense sites instead to the Secretary of Defense ("Secretary").  <u>See</u> <u>Colorado</u>, 990 F.2d at 1571 n.9.  Pursuant to that authority, the Secretary cleans up "formerly used defense sites" pursuant to the Defense Environmental Restoration Program, 10 U.S.C. §§ 2700-08.  10 U.S.C. § 2701(c) requires the Secretary to undertake action in response to such hazardous waste sites in accordance with CERCLA.  Therefore, the parties concede that the Defense Environmental Restoration Program "uses a cleanup process consistent with CERCLA and the National Contingency Plan, 40 C.F.R. Part 300," and thus, that 42 U.S.C. §§ 9604 and 9613(h) apply to this case.

release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C. § 5121 et seq.].

42 U.S.C. § 9601(23) (footnote omitted) (emphasis added). On the other hand, CERCLA defines

[t]he terms "remedy" or "remedial action" [to] mean[] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment . . . .

Id. § 9601(24).

The statutory definition of a removal action dictates that a removal action is ongoing and thus, that § 9613(h)'s jurisdiction strip applies, even if the Government has only begun to "monitor, assess, and evaluate the release or threat of release of hazardous substances." See Razore v. Tulalip Tribes of Washington, 66 F.3d 236, 239 (9th Cir. 1995) (holding that § 9613(h) stripped federal jurisdiction because the EPA had completed a remedial investigation and feasibility study, which constituted "such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances"); Boarhead, 923 F.2d at 1016, 1023 (concluding that § 9613(h) applied because the

EPA had given the plaintiff notice that it intended to study the release of hazardous substances at the plaintiff's farm).

In the instant case, the Government's removal actions are therefore sufficient to trigger § 9613(h). The Government has already undertaken several steps toward determining how it will address the contamination present on the Cannons' property. First, the Government has completed a preliminary assessment of the property. As part of this preliminary assessment, the Government conducted an "Archive Search Report" that compiled historical records, interviews, and site surveys to determine the exact nature of the military testing conducted on the Cannons' property. Based on the Archive Report, the Government then prepared and issued a "Draft Formerly Used Defense Site Engineering Evaluation/Cost Analysis Report." This draft report indicated that the Cannons' property was in fact highly contaminated.[5] Cannon, 338 F.3d at 1187–88. Finally, the record also indicates that the Government was planning its site inspection while this suit was pending before the district court.[6] These steps constitute the Government's efforts thus far to "monitor, assess, and evaluate" the

_____

[5] The Government never finalized this draft report due to several concerns, including funding limitations. The failure to finalize this report, however, did not stall the Government's administrative process because the report was merely a collateral step.

[6] The Government moved for us to take judicial notice of the final site inspection plan. This document is not necessary for the resolution of this appeal, and accordingly, we DENY the Government's motion.

hazardous substances on the Cannons' land, and therefore qualify as an ongoing removal action. Accordingly, we conclude that the Government has selected a removal action and thus triggered § 9613(h).

Contrary to this conclusion, the Cannons assert that the Government's conduct up to this point does not trigger § 9613(h) because the Government has not officially selected a removal or remedial action pursuant to the applicable regulations. The Cannons specifically contend that the Government has not selected a removal action until it has complied with the full panoply of the applicable regulations, which require the Government to conduct a site inspection, issue an engineering evaluation and cost assessment report, take public comments, and finally make a decision about the removal action based on the administrative record. See 40 C.F.R. § 300.415. We find this argument to be unpersuasive because it unduly restricts the plain language of § 9613(h). That section is a "blunt withdrawal" of the jurisdiction of federal courts, which applies once the Government has begun its removal action. See Potter, 343 F.3d at 624. Nothing in the statutory language suggests that Congress intended this jurisdiction-stripping provision to apply only once the Government has completed a substantial portion of its removal proceedings. See Razore, 66 F.3d at 239 (concluding that an interim step in the removal selection process—the preparation of an remedial investigation/feasibility study report—constituted an ongoing removal action sufficient to trigger § 9613(h)); Boarhead, 923 F.3d at 1023

(holding that § 9613(h) applied because the EPA had begun sufficient removal proceedings once it had communicated its <u>intent to conduct</u> a remedial investigation/feasibility study).[7] Therefore, we remain convinced that the district court properly concluded that the Government had selected a removal action pursuant to its authority under § 9604.[8]

## C.

Section 9613(h) applies only to "<u>challenges</u> to removal or remedial action." 42 U.S.C. § 9613(h) (emphasis added). A lawsuit challenges a removal action if it "calls into question [that removal] plan." <u>Gen. Elec.</u>, 467 F.3d at 1249. In other words, a suit challenges a removal action if it "interferes with the implementation of a CERCLA remedy" because "the relief requested will impact the [removal] action selected." <u>Broward Gardens Tenants Ass'n v. EPA</u>, 311 F.3d

---

[7] We recognize that this conclusion splits with the Seventh Circuit's holding in <u>Frey v. EPA</u>, 403 F.3d 828 (7th Cir. 2005). While we share the Seventh Circuit's concern regarding open ended remedial and removal actions undertaken by the Government, we conclude that the plain language of the statute mandates the result we reach here.

[8] In their reply brief, the Cannons assert that neither <u>Boarhead</u> nor <u>Razore</u> support the conclusion that a removal action commenced once the Government began monitoring, assessing, and evaluating the Cannons' property. The Cannons attempt to distinguish both cases by noting that those cases involved property that the EPA had previously listed on the National Priorities List ("NPL"). That fact, they assert, implicitly demonstrates that the EPA had completed all of the necessary regulatory steps to select a removal action.

In spite of the Cannons' argument, neither <u>Boarhead</u> nor <u>Razore</u> rely on (or even mention during the analysis) the placement of the properties on the NPL. Thus, we find the Cannons' attempts to distinguish the reasoning from these two cases unpersuasive.

- 14 -

1066, 1072 (11th Cir. 2002); see also Costner v. URS Consultants, Inc., 153 F.3d 667, 675 (8th Cir. 1998) (holding that a qui tam suit for monetary damages only against contractors engaged in a clean-up effort was not a challenge because it would not impact the removal action selected).

Turning to the instant case, there is no doubt that the Cannons' suit constitutes a challenge. The Cannons requested injunctive relief ordering the remediation of their property. Such relief would undoubtedly interfere with the Government's ongoing removal efforts. See Alabama v. EPA, 871 F.2d 1548, 1559 (11th Cir. 1989) (holding that a suit requesting injunctive relief constituted a challenge for the purposes of § 9613(h)). Therefore, we conclude that the Cannons' suit challenges the Government's ongoing removal action for the purposes of § 9613(h).

The Cannons attempt to avoid the broad standard for what constitutes a challenge by arguing that the cases applying that standard are inapposite because the Government has not yet selected a removal action. This argument merely rehashes the Cannons' earlier contention that a removal action begins only after the Government has selected it pursuant to the regulatory provisions at 40 C.F.R. § 300.415. Accordingly, the argument suffers a similar fate. As we noted above, the broad statutory language indicates that Congress intended to strip federal jurisdiction from any challenge that would interfere with an ongoing removal or remediation process. See, e.g., Potter, 343 F.3d at 624. Here, the Government's

conduct constitutes an ongoing removal action, with which the Cannons' suit would undoubtedly interfere. Thus, the case at bar constitutes a challenge.

### III.

The Cannons' suit sought to hasten the Government's cleanup efforts through injunctive relief. We are sympathetic to the Cannons' frustration with the long delays; however, their suit falls within the broad ambit of § 9613(h). Accordingly, we AFFIRM the district court's decision to dismiss the case. In addition, we DENY the Government's motion to take judicial notice of the final inspection plan.