PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 17-2473 & 17-3196
_____

KRISTEN GIOVANNI, Individually and as parent and
natural guardian of V.G., a minor, and D.G., a minor;
CHARLES GIOVANNI, Individually and as parent and
natural guardian of V.G., a minor and D.G., a minor;
ANTHONY GIOVANNI,
                                    Appellants in No. 17-2473

v.

UNITED STATES DEPARTMENT OF THE NAVY


DOROTHY PALMER; GEORGE PALMER,
                                    Appellants in No. 17-3196
v.

UNITED STATES DEPARTMENT OF THE NAVY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Nos. 2-16-cv-04873 and 2-17-cv-00765)
District Judge:  Hon. Gerald J. Pappert
_____

Argued
April 26, 2018

Before:  JORDAN, BIBAS, and SCIRICA, *Circuit Judges*

(Opinion Filed:  October 2, 2018)

_____

Mark R. Cuker            [ARGUED]
Amy Montemarano
Cuker Law
2005 Market Street – Ste. 1300
Philadelphia, PA  19103
        *Counsel for Appellants Kristen Giovanni, Charles*
        *Giovanni and Anthony Giovanni.*

Steven E. Angstreich        [ARGUED]
Amy R. Brandt
Weir & Partners
1339 Chestnut Street – Ste. 500
Philadelphia, PA  19107
        *Counsel for Appellants Dorothy Palmer*
        *and George Palmer*

Jeffrey H. Wood
Eric Grant
Chloe H. Kolman
Sonya J. Shea
Thomas J. Alford
Brian C. Toth
Jeffrey S. Beelaert            [ARGUED]
United States Department of Justice
Environment & Natural Resources Division

2

P.O. Box 7611
Ben Franklin Station
Washington, DC 20044
*Counsel for Appellee*

Deanna K. Tanner
Delaware Riverkeeper Network
925 Canal Street – Ste. 3701
Bristol, PA 19007
*Counsel for Amicus Appellants Delaware
Riverkeeper and Delaware Riverkeeper Network*

Suzanne I. Novak
Earthjustice
48 Wall Street – 19th Fl.
New York, NY 10005
*Counsel for Amicus Appellants Brendan Boyle, Lori
Cervera, Renee Frugoli, Hope Grosse, Yvonne Love,
Minda Ruch, Joanne Stanton and Jacquelyn Rose
Wiest*

Kevin S. Hannon
1641 Downing Street
Denver, CO 80218
*Counsel for Amicus Appellant Toxics Action Center*

————————————

OPINION OF THE COURT

————————————

JORDAN, *Circuit Judge*.

The Giovanni family and the Palmer family live in neighborhoods close to contaminated federal facilities that were owned and operated for decades by the United States Navy. The families filed separate suits in state court under the Pennsylvania Hazardous Sites Cleanup Act ("HSCA"), 35 Pa. Cons. Stat. §§ 6020.101-.1305, seeking orders requiring the Navy to pay for medical monitoring and to conduct a health assessment or health effects study that would include blood testing for themselves and others exposed to the hazardous substances released at the contaminated facilities. The Navy removed the cases to the United States District Court for the Eastern District of Pennsylvania, which concluded that the claims fell within the ambit of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA" or "the Act"), 42 U.S.C. §§ 9601-9675, and were challenges under that Act to ongoing cleanup efforts at the facilities. Based on that, the Court further decided that it lacked subject matter jurisdiction over the cases and dismissed them. The Giovannis and Palmers now appeal those orders of dismissal.

We will affirm in part. In our view, the claim for a health assessment or health effects study is barred, as the District Court said, because it challenges ongoing cleanup efforts. But we will vacate and remand in part because we conclude that the medical monitoring claim is not a challenge under CERCLA and that it is not barred by sovereign immunity.

4

## I.  BACKGROUND FACTS[1]

The Navy owns a number of properties in Pennsylvania, including the Willow Grove Naval Air and Air Reserve Station in Horsham Township and the Naval Air Development Center in Warminster Township (collectively, "the Naval Facilities").  Because of the Navy's activities, both facilities are contaminated with hazardous substances.  Among the contaminants are perfluorinated compounds ("PFCs"), including perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS").

Studies have identified the toxic effects that PFCs have on people, including increased risk of kidney cancer, testicular cancer, thyroid disease, ulcerative colitis, pregnancy-induced hypertension, and high cholesterol.  And

---

[1] The parties do not dispute any material facts bearing on the issue of subject matter jurisdiction, which makes the Navy's attack on the complaints under Rule 12(b)(1) a facial challenge rather than a factual one.  *See Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 268 (3d Cir. 2016) ("A facial 12(b)(1) challenge … attacks the complaint on its face without contesting its alleged facts[.]").  Thus, because we address a facial challenge, the facts set forth here come from the Giovannis' and Palmers' complaints and documents referenced therein, and are taken in the light most favorable to them.  *See Schuchardt v. President of the U.S.*, 839 F.3d 336, 343 (3d Cir. 2016) ("In a facial attack, we review only 'the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'" (quoting *Gould Elecs. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)).

the Environmental Protection Agency ("EPA") has specifically warned that drinking water containing PFOA and PFOS above certain thresholds poses health risks. It issued a non-binding provisional health advisory recommending a maximum combined PFOA/PFOS concentration in public drinking water of 70 parts per trillion (0.07 μg/L).

Groundwater sampling at both the Naval Facilities revealed that the PFOA and the PFOS levels exceeded the health advisory levels. Those facilities, being in need of further investigation to determine the nature and extent of the public health and environmental risks associated with chemical contamination, have been added to the National Priorities List ("NPL"), which is also sometimes called the Superfund List.[2] The Navy has begun environmental cleanup efforts, and the parties do not dispute that those efforts are ongoing in both places.

Kristen Giovanni, along with her husband Charles Giovanni, her son Anthony Giovanni, and two other minor children V.G. and D.G., lives across the street from the Willow Grove facility. The water from their private well had a combined PFOA/PFOS level of 2.88 μg/L, which exceeds the concentration exposure threshold recommended by the

---

[2] The NPL is a list, compiled by the EPA, of facilities throughout the United States and its territories that are considered "national priorities" among all the facilities known to have involved releases, or that threaten releases, of hazardous substances, pollutants, and contaminants. Superfund: National Priorities List (NPL), https://www.epa.gov/superfund/superfund-national-priorities-list-npl (last visited June 25, 2018).

EPA. The Navy provided the Giovannis with bottled water for several months before it connected them to the Warrington Township public water supply. But even that public water supply is contaminated with PFCs.

Dorothy Palmer, along with her son George Palmer, has lived less than one mile from the Warminster facility since 1981. For years, they used a private well on their property, until they learned about the PFOA and PFOS contamination in the groundwater. The water from their private well had a combined PFOA/PFOS level of 0.62 μg/L, which exceeds the combined exposure threshold recommended by the EPA. The Navy provided the Palmers with bottled water until it connected them to the Warminster Municipal Authority's public water supply. Subsequent testing of that supply has revealed PFC contamination there too.

## II.    PROCEDURAL HISTORY

The Giovannis filed a complaint against the Navy in the Montgomery County Court of Common Pleas, and the Palmers did the same in the Bucks County Court of Common Pleas. Both complaints alleged harm from the contaminated public and private water sources for residents around the Naval Facilities due to the Navy's allegedly improper disposal of hazardous substances. Each complaint included a single state law claim under HSCA seeking, among other things, the costs of medical monitoring and an order compelling the Navy to conduct a health assessment or health effects study that would include blood testing for themselves, and "others exposed to the contaminants and hazardous substances released from the Warminster and Willow Grove

7

[f]acilities[.]" (Palmer Appendix ("P.A.") at 16.) They also alleged that the Navy waived its sovereign immunity pursuant to § 120(a)(1) of CERCLA, 42 U.S.C. § 9620(a)(1), and § 6001(a) of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6961(a).

The Navy removed both cases to the District Court under 28 U.S.C. § 1442(a)(1). The Giovannis and Palmers then filed motions to remand their cases to state court. The Navy responded by moving to dismiss the cases without remand, which the Giovannis and Palmers opposed.

The District Court held a hearing on the competing motions in the Giovannis' case. The parties agreed that removal was proper under 28 U.S.C. § 1442, which prompted the Court to deny the motion for remand. Ultimately, the Court dismissed the Giovannis' complaint, and it issued a thorough and detailed memorandum opinion to support its decision. It concluded that § 113(h) of CERCLA[3] deprived it

---

[3]   Section 113(h), which is codified at 42 U.S.C. § 9613(h), states:

(h) Timing of review

No Federal court shall have jurisdiction under Federal law other than under section 1332 of Title 28 (relating to diversity of citizenship jurisdiction) or under State law which is applicable or relevant and appropriate under section [121 of the Act] (relating to cleanup standards) to review any challenges to removal or remedial action selected under section [104

8

of the Act], or to review any order issued under section [106(a) of the Act], in any action except one of the following:

(1) An action under section [107 of the Act] to recover response costs or damages or for contribution.

(2) An action to enforce an order issued under section [106(a) of the Act] or to recover a penalty for violation of such order.

(3) An action for reimbursement under section [106(b)(2) of the Act].

(4) An action under section [159 of the Act] (relating to citizens suits) alleging that the removal or remedial action taken under section [104 of the Act] or secured under section [106 of the Act] was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

(5) An action under section [106 of the Act] in which the United States has moved to compel a remedial action.

42 U.S.C. § 9613(h).

of jurisdiction to hear a claim that would interfere with an ongoing cleanup under CERCLA, and that the Giovannis' claims that the Navy should pay for medical monitoring and should provide a health study amounted to a challenge to the ongoing response actions at the Naval Facilities. The Court construed § 113(h) of CERCLA as depriving both it and the state courts of jurisdiction, and thus it dismissed the Giovannis' case under the doctrine of derivative jurisdiction, without remand.

The District Court then disposed of the Palmers' complaint in a footnote order granting the Navy's motion to dismiss, "consistent with the Court's Opinion in *Giovanni*[.]" (P.A. at 45.) In that order, the District Court rejected an additional argument raised by the Palmers, namely that the cleanup activities were initiated under § 120 of CERCLA[4]

---

[4] Section 120 of CERCLA, which is codified at 42 U.S.C. § 9620, clarifies that the Act applies to federal facilities:

> Each department, agency, and instrumentality of the United States (including the executive, legislative, and judicial branches of government) shall be subject to, and comply with, this chapter in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section [107 of the Act]. Nothing in this section shall be construed to affect the liability of any person or entity under sections [106 and 107 of the Act].

and were therefore not affected by § 113(h)'s jurisdictional bar. It concluded that the authority to clean up the Naval Facilities derived from § 104 of the Act,[5] not § 120.

The Giovannis and Palmers filed these timely appeals. Amicus briefs have been filed in support of the Giovannis and Palmers by the following groups: (1) the Delaware Riverkeeper Network and Maya van Rossum, also known as the Delaware Riverkeeper; (2) the Toxics Action Center; and (3) Brendan Boyle, Lori Cervera, Renee Frugoli, Hope Grosse, Yvonne Love, Minde Ruch, Joanne Stanton, and Jacquelyn Rose Wiest, all of whom currently live or formerly lived near the Naval Facilities.[6]

---

42 U.S.C. § 9620(a)(1).

[5] Section 104 of CERCLA, which is codified at 42 U.S.C. § 9604, authorizes the President "to remove or arrange for the removal of, and provide for remedial action" which he "deems necessary to protect the public health or welfare or the environment" whenever "any hazardous substance is released or there is a substantial threat of such a release into the environment[.]" 42 U.S.C. § 9604(a)(1).

[6] We are grateful for the additional insights provided by the amici.

11

**III.    DISCUSSION**[7]

We will affirm in part and vacate in part the District Court's dismissal of the Giovannis' and Palmers' complaints and will affirm its decision not to remand to state court. Although the requests for a government-led health assessment or health effects study are barred under § 113(h) as challenges to ongoing response actions, the requests for the costs associated with private party medical monitoring are not barred by that CERCLA provision because that relief does not interfere with or alter the ongoing cleanup efforts. Moreover, the relief sought by the Giovannis' and Palmers' on their medical monitoring claims is best characterized as injunctive relief, and the federal government has waived sovereign immunity to suits by private parties seeking such relief. We will therefore vacate the District Court's dismissal of the

---

[7] Our jurisdiction to review the District Court's rulings is uncontested and is rooted in 28 U.S.C. § 1291. The District Court's jurisdiction is contested. The Giovannis' and Palmers' state law claims were properly removed to federal court by the Navy under 28 U.S.C. § 1442(a) because the Navy presented colorable federal defenses, including that the claims are barred under § 113(h) of CERCLA and that it is entitled to sovereign immunity. *See Mesa v. California*, 489 U.S. 121, 136 (1989) (noting that removal is proper when a defendant demonstrates the presence of a federal question, either in the form of a federal claim or a colorable federal defense); *see also Parker v. Della Rocco*, 252 F.3d 663, 665 n.2 (2d Cir. 2001) (characterizing sovereign immunity as a federal defense when asserted by a federal agency). The parties dispute the applicability of those defenses, and we will address those disputes herein.

Giovannis' and Palmers' requests for costs associated with private party medical monitoring and remand for further proceedings on those claims.

Our review of a district court's grant of a motion to dismiss is plenary. *Bell v. Cheswick Generating Station*, 734 F.3d 188, 193 n.5 (3d Cir. 2013). When there is a facial attack on subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), *see supra* note 1, "we review only 'the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 343 (3d Cir. 2016) (quoting *Gould Elecs. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000)). Furthermore, "we exercise plenary review over a district court's interpretation of CERCLA[.]" *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 216 (3d Cir. 2010). And our review of a "[d]istrict [c]ourt's interpretation and application of legal rules and doctrines" is plenary. *McBride v. Int'l Longshoremen's Ass'n*, 778 F.3d 453, 458 (3d Cir. 2015).

### A. Lack of Jurisdiction Over "Challenges" Under § 113(h)

The Navy argues that federal courts are without jurisdiction to rule on the Giovannis' and Palmers' state law claims because they are barred under § 113(h) as "challenges" to ongoing cleanup efforts at the Naval Facilities. The Giovannis and Palmers, of course, disagree because, as they see it, their requested relief will not interfere with those ongoing efforts. We therefore first address whether state law claims seeking compensation to fund private party medical monitoring and state law claims seeking a government-led

13

health assessment or health effects study are "challenges to removal or remedial action" under § 113(h).[8] Our conclusion is that the latter are challenges but the former are not. To understand why, we turn to the pertinent portions of CERCLA.

That complex statute was enacted in 1980 "in response to the serious environmental and health risks posed by industrial pollution." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). It gives "the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994). CERLCA was designed, in part, "to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry.*, 556 U.S. at 602 (internal quotation marks and citations omitted).

Section 113(b) of the Act provides that "the United States district courts shall have exclusive original jurisdiction

---

[8] Medical monitoring is meant "to compensate plaintiffs who have been exposed to various toxic substances" by accounting for latent diseases or injuries. *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 849 (3d Cir. 1990). "[A]n action for medical monitoring seeks to recover only the quantifiable costs of periodic medical examinations necessary to detect the onset of physical harm[.]" *Id.* at 850. Under Pennsylvania law, medical monitoring claims are cognizable under HSCA and the common law. *Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 849 n.12 (3d Cir. 1995).

over all controversies arising under [CERCLA]." 42 U.S.C. § 9613(b). Pursuant to § 113(h), however, jurisdiction is unavailable under federal or state law "to review any challenges to removal or remedial action selected under section [104][9] …, or to review any order issued under section [106(a).][10]" *Id.* § 9613(h). Courts have described

---

[9] Section 104 of CERCLA defines response authorities under the Act, including the President's authority to institute removal and remedial actions to clean up contaminated facilities; it also sets forth limitations on his response authority, and exceptions to those limitations. *See* 42 U.S.C. § 9604(a). It details other cleanup-related matters too, including financial constraints, funding, interactions with state authorities, information gathering processes, and emergency response powers. *See generally id.* § 9604(b)-(k).

[10] That provision of the Act states:

In addition to any other action taken by a State or local government, when the President determines that there may be an imminent and substantial endangerment to the public health or welfare or the environment because of an actual or threatened release of a hazardous substance from a facility, he may require the Attorney General of the United States to secure such relief as may be necessary to abate such danger or threat, and the district court of the United States in the district in which the threat occurs shall have jurisdiction to grant such relief as the public interest and the equities of the case may require. The President may also, after notice to

§ 113(h) as "a 'blunt withdrawal of federal jurisdiction.'" *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 328 (9th Cir. 1995) (quoting *N. Shore Gas Co. v. EPA*, 930 F.2d 1239, 1244 (7th Cir. 1991)). It applies to "*any* challenges," not just those brought under CERCLA. *Id.* (emphasis added).

A well-established body of case law, including our own, provides guidance on what it means to "challenge" a response action. We have said that § 113(h) "clearly preclude[s] jurisdiction to delay or interfere with EPA clean-up activities[.]" *Boarhead Corp. v. Erickson*, 923 F.2d 1011, 1023 (3d Cir. 1991). Other courts have noted that "[a] lawsuit challenges a removal action if it 'calls into question'" the removal plan. *Cannon v. Gates*, 538 F.3d 1328, 1335 (10th Cir. 2008) (citation omitted). Put in more concrete terms, "a suit challenges a removal action if it 'interferes with the implementation of a CERCLA remedy' because 'the relief requested will impact the [removal] action selected.'"[11] *Id.*

_____

the affected State, take other action under this section including, but not limited to, issuing such orders as may be necessary to protect public health and welfare and the environment.

42 U.S.C. § 9606(a).

[11] *See also El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 880 (D.C. Cir. 2014) ("[A] claim is a § 113(h) 'challenge' if it will *interfere* with a 'removal' or a 'remedial action.'"); *McClellan*, 47 F.3d at 330 (describing the relief as a challenge under § 113(h) because it "would clearly interfere with the cleanup"); *Razore v. Tulalip Tribes of Wash.*, 66

16

(alteration in original) (quoting *Broward Gardens Tenants Ass'n v. EPA*, 311 F.3d 1066, 1072 (11th Cir. 2002)); *see also Costner v. URS Consultants, Inc.*, 153 F.3d 667, 675 (8th Cir. 1998) (indicating that a lawsuit is not a "challenge" under § 113(h) if it "would not involve altering the terms of [a] cleanup order" and "would result only in financial penalties" (citation omitted)).

In some cases, "it may be necessary to assess the nexus between the nature of the suit and the CERCLA cleanup: the more closely related, the clearer it will be that the suit is a 'challenge.'" *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 880 (D.C. Cir. 2014). Even though practically any lawsuit could "increase[] the cost of a cleanup or divert[] resources or personnel from it[,]" that does not mean that every suit, or every request for relief within a suit, automatically "challenges" the cleanup. *McClellan*, 47 F.3d at 330. Enforcement of minimum wage laws, for example, would have that effect, but seeking enforcement of such laws is too attenuated from the cleanup itself to be considered a challenge to the remediation activities. *Id.*

A suit challenges a response action if it would, for example, "dictate specific remedial actions and … alter the method and order for cleanup[.]" *Broward Gardens*, 311 F.3d at 1072 (first alteration in original) (quoting *Razore v. Tulalip Tribes of Wash.*, 66 F.3d 236, 239 (9th Cir. 1995)). Conversely, a lawsuit does not challenge a response action if it does not "call into question the selected … remedial or removal plan[.]" *Id.* at 1073.

---

F.3d 236, 239 (9th Cir. 1995) ("An action constitutes a challenge if it is related to the goals of the cleanup.").

To assess whether a suit is a challenge, we must also consider the meaning of the terms "removal" and "remedial" action as used in § 113(h). The statute defines "response" efforts to include "remove, removal, remedy, and remedial action[.]" 42 U.S.C. § 9601(25). Removal actions generally include short-term or immediate efforts, while remedial actions typically involve longer term activities. *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 293 (3d Cir. 2000).

CERCLA defines the term "removal" to mean:

the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken [sic] in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section [104(b) of CERCLA], and any emergency assistance which may be

provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C.A. § 5121 et seq.].

42 U.S.C. § 9601(23).

The even lengthier definition of "remedial action" is:

those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and

community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(24).

With those definitions in mind, we analyze whether the relief requested by the Giovannis and Palmers constitutes a challenge under §113(h) to ongoing cleanup efforts at the Naval Facilities. We take a holistic approach that encompasses several considerations. One is whether the relief can be classified as a "removal" or "remedial" step. Another and closely related consideration is the specific form of relief requested and whether it would compel the defendant to take some action or refrain from taking some action, or instead seeks to have the defendant pay for a third party to provide services. A further consideration is whether, on the whole, there is reason to think that a given request for relief will conflict with, impact, or otherwise interfere with the ongoing cleanup efforts.[12] We address each of those three considerations seriatim.

_____

[12] Our concurring colleague disagrees with our holistic approach and advocates a bright line test for determining

20

## 1. Removal and Remedial Actions

The provision at issue here – § 113(h) – states, in relevant part, that federal courts lack jurisdiction "to review

---

whether a claim for relief constitutes a challenge. The concurrence relies on the District of Columbia Circuit's opinion in *El Paso Natural Gas Company v. United States*, 750 F.3d 863, 880 (D.C. Cir. 2014), to propose "a single framework" for analysis – whether the claim for relief interferes with a removal or remedial action. Concur. Slip Op. at 2-3. But the analysis is not so simple and *El Paso* does not suggest that it is. The *El Paso* opinion does provide a helpful way to conceptualize what a challenge is, but the court acknowledged that there will be situations in which "it may be necessary to assess the nexus between the nature of the suit and the CERCLA cleanup" before being able to determine whether a claim for relief would "interfere" with a removal or remedial action. 750 F.3d at 880. It did not purport to set forth a single bright line test.

In laying out our analytical framework, we have relied on the collective experience of our own Court and our sister courts, including the D.C. Circuit in *El Paso*, to create an approach that we hope is sufficiently flexible to account for the myriad circumstances in which CERCLA litigation arises and yet clear enough to give useful guidance to district courts. We appreciate our colleague's desire to simplify the "challenge" analysis for the benefit of future litigants and courts, and we share that desire. But we think that a framework that relies on nothing but the word "interfere" to inform future litigation – a word that does not appear at all in the statutory text but rather emerged through case law – will not be as helpful as our colleague believes.

21

any challenges to removal or remedial action selected under section [104.]" *Id.* § 9613(h). Thus, if the requested relief can be classified as a removal or remedial action, it is possible that it will conflict with, impact, or otherwise interfere with an ongoing CERCLA cleanup for purposes of § 113(h). The question, then, is whether the Giovannis' and Palmers' requests for relief – private party medical monitoring and a government-led health study – fit the statutory definitions of removal or remedial action.

### a.     *Private Party Medical Monitoring*

The text of the statute does not suggest that private party medical monitoring is a removal action. The reference to "monitor[ing]" in the definition of "removal" refers to "monitor[ing], assess[ing], and evaluat[ing] the release or threat of release of hazardous substances," not the monitoring of individuals for latent diseases or injuries. 42 U.S.C. §9601(23). And while the definition of "removal" also includes "actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release," when read in context of the other actions listed, medical monitoring does not appear to be contemplated. *Id.* It is a standard principle of statutory construction that "a word [or phrase] is known by the company it keeps[.]" *Yates v. United States*, 135 S. Ct. 1074, 1085 (2015). That principle, known as *noscitur a sociis*, counsels courts "to 'avoid ascribing to one word [or phrase] a meaning so broad that it is inconsistent with its accompanying words [or phrases], thus giving unintended breadth to the Acts of Congress." *Id.* (citation omitted). The other actions listed in the definition of "removal" refer to activities directly

22

related to the physical removal, containment, assessment, or evaluation of hazardous waste, not broadly to all potential actions taken because of a toxic release. Furthermore, because removal actions focus on the short term, it would be odd to classify medical monitoring as a "removal" action, given that medical monitoring is a way to address problems that only emerge over time.

Nor does the text support classifying private party medical monitoring as a remedial action. Although medical monitoring is certainly "consistent with [a] permanent remedy[,]" it is not taken "to prevent or minimize the release of hazardous substances." 42 U.S.C. § 9601(24). And while the statutory definition of "remedial action" references "any monitoring reasonably required to … protect the public health and welfare and the environment," that monitoring expressly relates to the previously listed items in the definition, showing that the contemplated monitoring is "to assure that *such actions* protect the public health and welfare and the environment." *Id.* (emphasis added). The referenced "such actions" all relate to physical remediation efforts, including dredging, excavations, diversions, repairs, incineration, neutralization, and trenching. *See id.* The text of the statute therefore does not easily support classifying private party medical monitoring as either a "removal" or a "remedial" action, and, consequently, it is not a response action. *See* 42 U.S.C. § 9601(25) (defining "response" in terms of "removal" and "remedial" actions).

There is precedent for our interpretation. In *Daigle v. Shell Oil Co.*, for example, the United States Court of Appeals for the Tenth Circuit held that medical monitoring does not meet the statutory definitions for removal and

23

remedial actions because both definitions were "directed at containing and cleaning up hazardous substance releases[,]" not "[l]ongterm health monitoring." 972 F.2d 1527, 1535 (10th Cir. 1992); *see also Price v. United States Navy*, 39 F.3d 1011, 1016-17 (9th Cir. 1994) (concluding, in the context of a response cost analysis under § 107(a) of CERCLA, 42 U.S.C. § 9607(a), that "medical monitoring" does not fit the definition of "removal" or "remedial" action as defined under CERCLA); *cf. Syms v. Olin Corp.*, 408 F.3d 95, 105 (2d Cir. 2005) (same).[13]

The District Court distinguished those cases by stating that they involved an assessment of whether medical monitoring expenses are response *costs*. It said that the reasoning in those cases is "flawed because it assumes that 'response costs' and 'response' mean the same thing under CERCLA," but "[t]hey do not." (Giovanni Joint Appendix ("G.J.A.") at 114.) The Court determined instead that, while

---

[13] *See also Ambrogi v. Gould, Inc.*, 750 F. Supp. 1233, 1244-50 (M.D. Pa. 1991) (concluding that CERCLA's definition of "removal" does not encompass medical monitoring); *Bolin v. Cessna Aircraft Co.*, 759 F. Supp. 692, 713-14 (D. Kan. 1991) (same); *Lutz v. Chromatex, Inc.*, 718 F. Supp. 413, 418 (M.D. Pa. 1989) (determining that the definition of "response" did not include medical monitoring); *Coburn v. Sun Chem. Corp.*, No. 88-0120, 1988 WL 120739, at *6 (E.D. Pa. Nov. 9, 1988) (stating that it was "difficult to understand how future medical testing and monitoring of persons who were exposed to contaminated well water prior to the remedial measures currently underway" could constitute a "removal" action under CERCLA).

24

all "removal and remedial actions" are "responses" under CERCLA, not all such actions are "response costs." (G.J.A. at 114-15.) Therefore, it concluded, it "does not follow that all 'response costs' are necessarily 'removal and remedial actions.'" (G.J.A. at 115.) We disagree with that analysis.

As the District Court noted, those particular cases cited by the Giovannis and Palmers were deciding whether a private party could recover the costs of medical monitoring under CERCLA, which required an assessment of whether medical monitoring expenses were "response costs" under § 107(a).[14] But the District Court's heavy reliance on a distinction between the terms "response" and "response cost" is not sound. It is true that CERCLA defines "response," but not "cost" or "response cost." *See* 42 U.S.C. § 9601; *cf. Redland Soccer Club, Inc. v. Dep't of Army of U.S.*, 55 F.3d 827, 849 (3d Cir. 1995) ("The absence of a definition of 'response costs' has been the source of much litigation since CERCLA's enactment."). Yet to discount the cases cited by the Giovannis and Palmers simply because they speak most directly to "response costs" rather than "response" actions, is, we believe, to miss their significance. Those cases undertake practically identical analyses to determine whether medical monitoring is a "removal" or "remedial action," and thus necessarily a "response," en route to determining whether it is

---

[14] Section 107(a), a provision for cost recovery claims, is one mechanism CERCLA provides for potentially responsible parties to recoup costs expended in cleaning up a contaminated site. 42 U.S.C. § 9607(a); *see also Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 216-18 (3d Cir. 2010) (summarizing the cost recovery mechanisms provided under CERCLA, including § 107(a)).

a "response cost." *See Durfey v. E.I. DuPont de Nemours & Co.*, 59 F.3d 121, 124-25 (9th Cir. 1995); *Yslava v. Hughes Aircraft Co.*, 845 F. Supp. 705, 708-09 (D. Ariz. 1993). Regardless of the relationship between "response" and "response cost," the cases concluded that private party medical monitoring is not a "response" action and so, by definition, is neither a removal or remedial action. *Durfey*, 59 F.3d at 125; *Yslava*, 845 F. Supp. at 709.

The Navy argues that medical monitoring should nevertheless be considered a "removal or remedial action" under CERCLA because of that statute's provisions concerning the Agency for Toxic Substances and Disease Registry ("ATSDR"). The ATSDR was created when CERCLA was enacted in 1980, and its purpose is the "compiling [of] health effects information[.]" 2 Susan M. Cooke, The Law of Hazardous Waste § 12.04[2][f]. When CERCLA was amended by the Superfund Amendments and Reauthorization Act of 1986 ("SARA"), Congress recognized "that inadequate attention had been given to the health effects of contaminants found at Superfund sites[.]" *Id.* Thus, it expanded the role of the ATSDR. *Id.* § 12.05[2][h].

The charge given to the agency is to "effectuate and implement [CERCLA's] health related authorities[.]" 42 U.S.C. § 9604(i)(1). It is expressly authorized to "establish[] a health surveillance program[,]" *id.*, and, in some instances, the statute requires it to initiate such a program, *id.* § 9604(i)(9). Health surveillance programs must include, but are not limited to, "periodic medical testing where appropriate of population subgroups to screen for diseases for which the population or subgroup is at significant increased risk … [, and the programs further include] a mechanism to refer for

treatment those individuals within such population who are screened positive for such diseases." *Id.*

Agreeing with the Navy, the District Court said that, because those CERCLA provisions relating to the ATSDR provided for a program that included "both periodic medical testing … and a mechanism to refer for treatment anyone who needs medical attention[,]" the medical monitoring requested by the Giovannis was a "removal" or "remedial" action as defined by the statute. (G.J.A. at 112 n.6.) The Court did not explore the connection, though, between CERCLA's definitions of "removal" or "remedial" action and its provisions relating to the ATSDR. We think that connection depends on the distinction between private party actors and state actors.

The United States Court of Appeals for the Ninth Circuit has thoroughly considered whether the ATSDR's health "surveillance activit[ies] … [are] removal or remedial action[s] entitled to the protection of [§ 113(h)]." *Hanford Downwinders Coalition, Inc. v. Dowdle*, 71 F.3d 1469, 1475 (9th Cir. 1995). It decided that they are, explaining that the pertinent statutory provision – § 104 – was titled "response authorities," and "Congress gave no indication that the universe of CERCLA response authorities cannot include both the health and non-health related activities found in [§ 104.]" *Id.* at 1475-76. The court noted that other parts of § 104 also contemplated actions of public health authorities being "response measures," because the President was authorized to "take any other response measure … necessary to protect the public health or welfare or environment." *Id.* at 1476 (quoting 42 U.S.C. § 9604(a)(1)). It thus concluded that "Congress' single reference to ATSDR authorities as 'health

27

related' should be read narrowly as a means to distinguish between different types of response authorities, rather than interpreted broadly as an effort to differentiate ATSDR health … surveillance activity from response actions protected by [§ 113(h)]."[15] *Id.*

Significantly, the court did not believe that its conclusion undermined its previous decisions in *Durfey* and *Price*, which "held that *private party* medical monitoring activities, initiated and coordinated independently of ongoing CERCLA cleanup efforts, were not … removal or remedial actions." *Id.* at 1477. It said that the reasoning in those cases did "not apply to health … surveillance actions engaged in by *a governmental agency* pursuant to explicit CERCLA provisions." *Id.* (emphasis added). It further said that its interpretation was "rooted in the distinction Congress drew between public and private efforts to monitor the public health." *Id.* at 1478. Congress used the ATSDR to "expand the role [of] government health … surveillance[,]" but did nothing to add back in the personal rights to recovery of medical expenses (such as for private party medical monitoring) that were intentionally excised from original drafts of CERCLA. *Id.* at 1479.

---

[15] The court limited its holding to the specific ATSDR activities under review because it noted that not all ATSDR activities should qualify "per se [as] removal or remedial actions for purposes of CERCLA's Timing of Review provision." *Hanford*, 71 F.3d at 1476. That is because some of the agency's duties would not ordinarily constitute response actions, such as the ATSDR's general duties to maintain various health-related registries and inventories. *Id.* at 1476 n.9.

28

The court bolstered its conclusion that ATSDR's health surveillance activities are response actions with three reasons related to CERCLA's remedial purposes. *Id.* at 1481. First, Congress has made it clear, especially with the enactment of SARA, that one of CERCLA's goals is to protect the public health. *Id.* Second, there are many instances in which CERCLA privileges governmental efforts over private party efforts. *Id.* Finally, recognizing that the ATSDR's activities constitute "removal or remedial action" is most consistent with Congress's effort to integrate the agency's functions into NPL cleanups. *Id.* at 1474, 1481-82.

The analysis provided by the Ninth Circuit Court in *Hanford* is persuasive. We adopt it, with the conclusion that CERCLA distinguishes between private party medical monitoring activities and government-led health surveillance.[16] Private party medical monitoring falls outside of the definition of response action, but government-led monitoring does not.[17]

---

[16] The Ninth Circuit also determined "that the ATSDR health … surveillance activities [at the specific site in question] satisfy the definition of removal action." *Hanford,* 71 F.3d at 1477. We do not need to, and thus do not, decide that here. Although the classification of response actions as either removal or remedial actions may have significant legal and practical consequences under the Act in other circumstances, it is enough here for us to conclude that the ATSDR's health surveillance activities are response actions.

[17] The concurrence disagrees that the distinction between private actors and government actors makes a

29

Accordingly, the Giovannis' and Palmers' requests for an order compelling the Navy to pay for the costs associated with private party medical monitoring is relief that falls outside of CERCLA's definition of "removal or remedial action." And that counsels in favor of concluding that their requests do not, under § 113(h), constitute a jurisdiction-stripping challenge to an ongoing CERCLA response action.

### b. Health Assessment or Health Effects Study

We turn next to the Giovannis' and Palmers' requests for a government-led health assessment or health effects study. As a general matter, a health study would not fit the

---

difference in the analysis of whether a claim for relief constitutes a challenge. Concur. Slip Op. at 3-4. Our colleague stresses that the statutory language focuses on "actions" and not "actors." *Id*. We take a different message from the existence of the ATSDR provisions, which create a framework for government actors to conduct medical monitoring and health effect studies. 42 U.S.C. § 9604(i). Those statutory provisions show that Congress has made a distinction between government action and private action. When a court orders the government to do something – particularly something that, like a health effects study contemplated by the ATSDR provisions, is already regulated by statute – separation-of-powers issues may be implicated that would not be when ordering action from a private party. That seems a pertinent factor to consider in determining whether a claim interferes with the work of the government in a cleanup.

30

statute's definition of removal action for the same reasons that private party medical monitoring falls outside that definition. References to "assess[ing]" or "evaluat[ing]" refer to "the release or threat of release of hazardous substances," not the study of the effects of contaminants on human health. 42 U.S.C. § 9601(23). And the definition's inclusion of "actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare" does not contemplate a generic health study because such a study does not align with the subsequent list of activities directly related to the evaluation of hazardous waste in connection with its immediate removal. *Id.* Nor does the text of the statute support classifying a generic health study as a remedial action. Such a study is not taken "to prevent or minimize the release of hazardous substances," and it does not necessarily relate to conducting an evaluation or assessment to promote environmental remediation efforts. 42 U.S.C. § 9601(24).

But the Giovannis and Palmers are not requesting a generic health study. They want a government-led health assessment or health effects study. One of the things the ATSDR is charged with "effectuat[ing] and implement[ing]" is the completion of a "health assessment" within one year of an EPA proposal to list a site on the NPL.[18] *Id.* § 9604(i)(1),

_____

[18] The statute defines the term "health assessment" to mean:

> preliminary assessments of the potential risk to human health posed by individual sites and facilities, based on such factors as the nature and extent of contamination, the existence of potential pathways of human exposure

31

(6)(A). The purpose of that assessment is "to assist in determining whether actions … should be taken to reduce human exposure to hazardous substances from a facility and whether additional information on human exposure and associated health risks is needed and should be acquired[.]" *Id.* § 9604(i)(6)(G). Among the ways to acquire that information is "conducting epidemiological studies[.]" *Id.* If such a health assessment leads the ATSDR Administrator to conclude "that there is a significant increased risk of adverse health effects in humans from exposure to hazardous substances[,]" then the statute requires the ATSDR to set up a health surveillance program for the affected population. *Id.* § 9604(i)(9).

As discussed above with respect to private party medical monitoring, Congress differentiated between government-led and private efforts to assess and protect the

---

> (including ground or surface water contamination, air emissions, and food chain contamination), the size and potential susceptibility of the community within the likely pathways of exposure, the comparison of expected human exposure levels to the short-term and long-term health effects associated with identified hazardous substances and any available recommended exposure or tolerance limits for such hazardous substances, and the comparison of existing morbidity and mortality data on diseases that may be associated with the observed levels of exposure.

42 U.S.C. § 9604(i)(6)(F).

public health following a release or threat of release of hazardous waste. *Hanford*, 71 F.3d at 1478. Government-led health studies, unlike generic health studies conducted by private parties, are response actions deemed by Congress as necessary for evaluating the release or threatened release of hazardous substances. *See id.* at 1475, 1477 (concluding that ATSDR health assessment activities are removal or remedial actions for purposes of § 113(h)). That conclusion comports with Congress's goal of protecting the public health when it enacted SARA, as well as being consistent with CERCLA's favoring of governmental efforts over private party efforts, and Congress's effort to integrate the ATSDR's functions into the cleanups of Superfund sites. *Id.* at 1481-82.

Here, unlike their requests for private party medical monitoring, the Giovannis' and Palmers' requests that the District Court order the Navy to conduct a health assessment or health effects study, including blood testing, do constitute removal or remedial actions for purposes of § 113(h). Because the ATSDR has authority to conduct health assessments on behalf of the government at contaminated facilities, and those activities are response actions under CERCLA, the Giovannis' and Palmers' demand that another agency of the government conduct such a study would, if granted, interfere with a response action under CERCLA.

Therefore, we agree with the District Court's determination that the requested relief mandating that the Navy perform a health assessment or health effects study is a

response action under CERCLA, which suggests that it is a challenge under § 113(h).[19]

<hr/>

[19] The concurrence would not construe the requests for a health effects study as a response action because § 107(a)(4)(A) refers to "removal or remedial action" and § 107(a)(4)(D) separately refers to "any health assessment or healthy effects study carried out under [the ATSDR provisions.]" Concur. Slip Op. at 4-6. According to the concurrence, § 107(a)(4)(D) would be "superfluous" if a health effect study were to be construed as a removal or remedial action. *Id.* at 5. But, as the concurrence itself highlights, § 107(a)(4)(D) was grafted onto the statute as part of the SARA amendments to CERCLA. *Id.* The addition of § 107(a)(4)(D) suggests that Congress wanted to emphasize that CERCLA liability encompassed the costs of government-led health effects studies; it does not demonstrate unambiguous congressional intent to remove government-led health effects studies from the ambit of all remedial or removal actions. *Cf. Hanford*, 71 F.3d at 1479 ("[W]e decline to read the failure of Congress to accomplish the seamless integration of ATSDR provisions with the other response authorities found under sub-section [107(a)(4)] as compelling proof of Congress' intent to distinguish ATSDR activities from removal and remedial actions."). Had Congress enacted § 107(a)(4)(A) and § 107(a)(4)(D) at the same time, then the concurrence's statutory structure argument might have more persuasive force. But the timing of the SARA amendments significantly undermines the position pressed by our colleague. Moreover, the Ninth Circuit has been characterizing ATSDR activities as removal and remedial actions for nearly a quarter century. *Hanford*, 71 F.3d at 1479-80. If Congress thought that the courts had

34

## 2.     Form of Relief Requested

When assessing whether a claim challenges an ongoing cleanup effort, courts have also distinguished among forms of relief as they affect the defending party.[20] Generally, requests for injunctive relief that relate in any way to pending response actions are viewed as challenges under § 113(h).  If a plaintiff demands that a defendant engage in activities that could have been a part of the cleanup plan, then it is a challenge to the selected response actions.  *See, e.g., McClellan*, 47 F.3d at 329-30 (concluding that injunctive relief injecting new requirements into a CERCLA cleanup effort would clearly constitute a challenge because it would interfere with those ongoing activities).  In contrast, requests that require little more of the defendant than the expenditure of money are generally not considered to be "challenges" under § 113(h).  *See, e.g., Beck v. Atl. Richfield Co.*, 62 F.3d 1240, 1242-43 (9th Cir. 1995) (concluding that a request for compensatory damages for crop loss, lost profits, and property devaluation due to water contamination was not a challenge because the damages claim did not interfere with the existing remedial plan).

---

gotten it wrong, we hope it would have said something by now.

[20]  We note again that § 113(h) only applies when the response actions at issue were selected under § 104, which authorizes the President to take certain actions, or when the order implicated was issued under § 106(a), which refers to additional actions the President may take.

35

But the adjectives "injunctive" and "monetary" are descriptors, not by themselves reasoned conclusions. The effect that the sought-for relief has on the cleanup is what must be determinative, not the label a party or court uses to describe the claim for relief. For example, a request that the defendant pay damages could constitute a challenge under § 113(h) if it directly conflicts with the implementation of the cleanup plan. *See Pakootas v. Teck Cominco Metals, Ltd.*, 646 F.3d 1214, 1221-22 (9th Cir. 2011) (construing a private plaintiff's request for civil penalties resulting from the defendant's noncompliance with an EPA administrative order as a challenge to an ongoing cleanup because the EPA had chosen not to sue to enforce its order and was using the leverage of civil penalties to ensure the defendant completed the remediation). And, conversely, a request for injunctive relief that has no effect on an ongoing cleanup is unlikely to constitute a challenge. *See ARCO Envtl. Remediation, L.L.C. v. Dep't of Health & Envtl. Quality of Mont.*, 213 F.3d 1108, 1113, 1115 (9th Cir. 2000) (holding that injunctive relief ordering the release of documentation to the public about a contaminated site does not challenge a pending cleanup effort because access to information "does not alter cleanup requirements or environmental standards" and does not "terminate or delay the … cleanup"). We must consider the form of relief that the plaintiffs request and its impact on the defendant to determine whether the requested relief challenges an ongoing cleanup.

### a. *Private Party Medical Monitoring*

Focusing on the specific relief requested here, payment for the costs of a private party medical monitoring program

does not appear to be a challenge under § 113(h). The prayer for relief at the end of each complaint expressly states that the Giovannis and Palmers want the Navy to provide "the costs of medical monitoring[.]" (G.J.A. at 27; P.A. at 16.) In their briefing, the Giovannis and Palmers insist that the relief "would simply impose the costs of setting up a medical monitoring trust fund on the [Navy.]" (Giovannis' Opening Br. at 10; Palmers' Reply Br. at 9-10.) Thus, according to both the Giovannis' and Palmers' characterization of the relief that they seek with respect to medical monitoring, the Navy need do nothing but fund a trust. That counsels in favor of concluding that the relief associated with the Giovannis' and Palmers' medical monitoring claim is not a challenge under § 113(h). This is especially so because, as noted earlier, the private party medical monitoring program the Giovannis' and Palmers' want the Navy to fund is not a removal or remedial action.

### b. *Health Assessment or Health Effects Study*

The government-led health study requested by the Giovannis and Palmers, when viewed through the form-of-relief lens, appears in contrast to be a challenge under § 113(h) to ongoing response efforts at the Naval Facilities. That relief amounts to a demand that the Navy take on additional efforts related to cleaning up the contamination at those Superfund sites. Although the facts in this case differ from those in *Hanford*, which involved an injunction compelling the ATSDR to implement a health surveillance program, the relief requested here is analogous because the government is being asked to conduct a response action that the ATSDR may still be contemplating. And like the

37

plaintiffs in *McClellan*, who wanted the court to impose additional RCRA reporting and permitting requirements upon an ongoing cleanup, the requested injunctive relief here would interfere with the ongoing cleanup efforts at the Naval Facilities because it would modify or replace the existing remedial plan. The request for a government-led health assessment or health effects study is therefore effectively a request for injunctive relief, which counsels in favor of concluding that it is barred as a challenge under § 113(h).

### 3. Impact on Ongoing Cleanup Efforts

Another consideration is whether, on the whole, there is some additional reason to think that a given request for relief will conflict with, impact, or otherwise interfere with an ongoing cleanup effort. *See Boarhead*, 923 F.2d at 1023 (indicating that § 113(h) bars lawsuits that will "interfere with" ongoing remediation activities); *see also Cannon*, 538 F.3d at 1335 (stating that § 113(h) precludes lawsuits that will "interfere[] with the implementation of a [selected] CERCLA remedy" (citation omitted)).

### a. Private Party Medical Monitoring

It seems unlikely that the Giovannis' and Palmers' requests for the costs of private party medical monitoring will conflict with, impact, or otherwise interfere with the ongoing cleanup efforts at the Naval Facilities. It will "in no way impede[] the progress of the government's ongoing assessment and cleanup" at the contaminated site. *Yslava*, 845 F. Supp. at 710; *see also Durfey*, 59 F.3d at 126 (holding that the plaintiffs' claim for private party medical monitoring

38

costs under state tort law was not a "challenge" to an ongoing CERCLA cleanup under § 113(h)). Moreover, an order requiring the Navy to pay a sum of money to fund a private party medical monitoring program will "not in any manner … interfere with the ongoing activities of the ATSDR." *Boggs v. Divested Atomic Corp.*, No. C-2-90-840, 1997 WL 33377790, at *6 (S.D. Ohio Mar. 24, 1997). Although any money the Navy would provide to fund private party medical monitoring could divert funds from the cleanup efforts at the Naval Facilities, that is insufficient, standing alone, to render such relief a challenge under § 113(h). *See, e.g., El Paso Nat. Gas*, 750 F.3d at 880 ("[E]very action that increases the cost of a cleanup or diverts resources or personnel from it does not thereby become a 'challenge' to the cleanup." (quoting *McClellan*, 47 F.3d at 330)).

The District Court nevertheless held that the medical monitoring claims are barred by § 113(h) because they challenge the ongoing cleanups at the Naval Facilities. In so holding, it relied heavily on our decision in *Boarhead*. We said in that case that "Congress enacted CERCLA so that the EPA would have the authority and the funds necessary to respond expeditiously to serious hazards without being stopped in its tracks by legal entanglement before or during the hazard clean-up." 923 F.2d at 1019. We also said that the jurisdictional bar in § 113(h) was "designed to prevent time-consuming litigation from delaying the prompt clean-up of these [contaminated] sites." *Id.* Notably, we described "disputes about who is responsible for a hazardous site, what measures actually are necessary to clean-up the site and remove the hazard[,] or who is responsible for its costs" as lawsuits best left for "after the site has been cleaned up." *Id.*

The District Court here concluded that requiring the Navy to pay for medical monitoring would interfere with the ongoing cleanup efforts because it "would necessarily entail deciding a 'dispute[] about who is responsible for [the] hazardous site' and 'who is responsible for its costs.'" (G.J.A. at 113 (alterations in original) (internal citations omitted).) The Court said that those "are decisions that Congress determined 'should be dealt with after the site has been cleaned up.'" (G.J.A. at 113 (quoting *Boarhead*, 923 F.2d at 1019).)

That reliance on *Boarhead* is understandable but, in this instance, misplaced. The plaintiff in that case was "challenging the EPA's ability to conduct an [environmental] study pursuant to § 104 of CERCLA before the EPA perform[ed] an appropriate review[.]" *Boarhead*, 923 F.2d at 1018. The plaintiff was thus directly interfering with the EPA's ability to conduct a cleanup because it was seeking injunctive relief that would certainly have altered the existing remedial plans. The facts here are quite different. The Giovannis and Palmers want the Navy to fund a trust to cover the costs of private party medical monitoring rather than to take some additional action. And it is not clear that there would be any litigation about who is responsible for the contamination or the costs of the cleanup. The Navy freely admits that it "generated hazardous waste" and "released PFOA and PFOS" contaminants at the Naval Facilities. (Answering Br. at 11, 13.)

Finally, the District Court specifically distinguished the conclusions in *Durfey* and *Yslava* that private party medical monitoring claims are not challenges under § 113(h) because, in its view, those cases failed to explain why state

40

law medical monitoring claims are not disputes about who is responsible and hence, under § 113(h), should be dealt with after the cleanup is complete. But we should not expect a discussion of "responsibility" for "necessary costs of response" and "response actions" in a case in which there has already been a determination that the requested remedy is not a "response" or "response cost." Furthermore, *Durfey* involved a government-owned property that was contaminated with radioactivity during the development of the atomic bomb in the 1940s, so there was likely no dispute that the government was responsible for the contamination. Thus, the District Court's conclusion that the Giovannis' and Palmers' requests for the costs of private party medical monitoring were challenges for purposes of § 113(h) is, in our estimation, without adequate support.

### b. Health Assessment or Health Effects Study

The story is different for a government-led health study. There is reason to believe that the Giovannis' and Palmers' requests that the Navy conduct a health assessment or health effects study will conflict with, impact, or otherwise interfere with the ongoing cleanup efforts at the Naval Facilities. That relief "seeks to improve on the CERCLA cleanup" by adding work to the removal or remedial action already selected by the federal government at those facilities. *El Paso Nat. Gas*, 750 F.3d at 880-81 (quoting *McClellan*, 47 F.3d at 330). Ordering such relief necessarily preempts the federal government's "ability to choose the best remedial action among a panoply of remedial alternatives that have been analyzed in a completed remedial investigation and feasibility study according to criteria articulated in

41

CERCLA," *id.* at 881, especially with respect to those provisions relating to the ATSDR's powers and obligations. Thus, the District Court's conclusion that the Giovannis' and Palmers' requests for a government-led health study are challenges for purposes of § 113(h) is supported by the case law.

In sum, we conclude that the Giovannis' and Palmers' requests for funds to establish a private party medical monitoring program are not challenges for purposes of § 113(h),[21] but their requests for an order mandating that the Navy conduct a health assessment or health effects study are. We therefore lack jurisdiction to review those latter requests at this time.

---

[21] That conclusion is consistent with our decisions in the *In re Paoli* cases. *See In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829 (3d Cir. 1990) ("*Paoli I*"); *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ("*Paoli II*"); *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444 (3d Cir. 1997) ("*Paoli III*"). In those cases, despite ongoing cleanup efforts by the EPA, we said that the plaintiffs could move forward with their state law claims for medical monitoring. *See, e.g.*, *Paoli III*, 113 F.3d at 449 n.2; *Paoli II*, 35 F.3d at 785-95. Although we did not discuss § 113(h) in those cases, if we had reached a conclusion different than we do here, it would have undermined our jurisdiction to have decided them. *See also Clinton Cty. Comm'rs v. EPA*, 116 F.3d 1018, 1025 (3d Cir. 1997) (en banc) (concluding that § 113(h)'s bar to challenges of ongoing EPA remedial efforts strips the federal courts of subject matter jurisdiction).

### 4. The Palmers' Argument Under § 120 of CERCLA

Notwithstanding any argument under § 113(h), the Palmers argue that the cleanup activities at the federal Naval Facilities were initiated under § 120 rather than § 104, and thus that § 113(h) is inapplicable to bar their state-law claim. The Navy counters that § 120 merely describes additional procedures unique to federal land, and does not confer any authority outside of that already granted in § 104. We agree with the Navy.

Section 113(h), by its plain text, bars "challenges to removal or remedial action selected under section [104] of [CERCLA.]" 42 U.S.C. § 9613(h). Section 104 broadly prescribes the applicable response authorities available under the statutory scheme. *See* 42 U.S.C. § 9604. Meanwhile, § 120, which is titled "Federal facilities[,]" describes the application of CERCLA's provisions to federal facilities.

Our analysis of a statute begins, of course, with the text. *Haberle*, 885 F.3d at 178. Section 104 states that "the President is authorized to act … to remove or arrange for the removal of, and provide for the remedial action relating to … [a] hazardous substance, pollutant, or contaminant at any time …, or take any other response measure … [he] deems necessary to protect the public health or welfare or the environment." 42 U.S.C. § 9604(a)(1). That authority is granted in the broadest terms. There are a number of references to a "facility" or "facilities," but there is no indication that Congress meant to distinguish between federal and non-federal facilities, or between Superfund and non-Superfund sites. Furthermore, § 101(9) provides a definition

of the term "facility" and also fails to distinguish between the federal and non-federal, or the Superfund and non-Superfund, nature of a site.[22]  Thus, the text of § 104 authorizes the President to take response actions at any facility with respect to any hazardous release, including a federal facility listed on the NPL.

Section 120, which was added to CERCLA in 1986, *see* Pub. L. No. 99-499, 100 Stat. 1613 (1986) (codified at 42 U.S.C. § 9601 *et seq.*), has ever since been a source of confusion because of its imprecise language.  It states that every "department, agency, and instrumentality of the United States … shall be subject to, and comply with, [CERCLA] in the same manner and to the same extent, both procedurally and substantively, as any nongovernmental entity, including liability under section [107] of [the Act]."  42 U.S.C. § 9620(a)(1).  It then provides a number of specific duties and

---

[22]  Section 101(9) defines "facility" to mean:

(A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

42 U.S.C. § 9601(9).

procedures for the Administrator of the EPA with respect to federal facilities. *See generally id.* § 9620. One of the subsections of § 120 says that "no authority vested in the Administrator under this section may be transferred, by executive order of the President or otherwise, to any other officer or employee of the United States or to any other person." *Id.* § 9620(g). While that suggests that some authority has been granted to the federal government under § 120, that does not mean that the authority is necessarily independent from, and did not otherwise already exist in some form, under § 104 or some other section of CERCLA. Section 120 is best understood as clarifying the application of already existing CERCLA authority, like § 104, to federal facilities.[23]

---

[23] An executive order from the person authorized to act under § 104 – the President of the United States – supports that reading. Specifically, Executive Order 12,580 demonstrates that the President and his staff thought CERCLA conferred authority for him to initiate response actions under §§ 104, 113, 117, 119, 121, and 126 of that statute, because he delegated the functions vested under those provisions to various federal departments and agencies. Exec. Order No. 12,580, 52 Fed. Reg. 2923, 2924-25 (Jan. 23, 1987). He did not distinguish between federal facilities and non-federal facilities in that delegation of authority. *See id.* at 2924 (delegating CERCLA functions in Section 2(e)(1) of the Order). Although the Palmers read Section 2(e)(1) of the Order, which is limited to facilities not on the NPL, as suggesting that § 104(a) only granted the President authority to act with respect to federal facilities not listed on the NPL, that is not the most logical reading. A better reading is that the President simply did not delegate the full scope of his

Other courts have similarly concluded that § 120 is not an independent and wholly separate grant of authority from § 104 for the cleanup of federal facilities. In *Werlein v. United States*, the court held that a remedial action at a federal facility was taken "under section [104], subject to the requirements of section [120]." 746 F. Supp. 887, 892 (D. Minn. 1990), *vacated in part on other grounds*, 793 F. Supp. 898 (D. Minn. 1992). It reasoned that § 104(a)(1) grants the President response authority, which he delegated in Executive Order 12,580 to various agencies, both with respect to private land and federal land. *Id.* at 891. The court then explained that § 120 "provides a road map for application of CERCLA to federal facilities[,]" and that there would be little reason for the President to delegate response authority to the Secretary of Defense "[i]f section [104] did not apply to federal facilities." *Id.* at 891-92. Although it acknowledged that some aspects of § 120 could be read to suggest it was providing a "separate and distinct" source of cleanup authority for federal facilities, the court said it was better to consider § 120 as a mere set of "separate procedures for federal facility cleanups[.]" *Id.* at 892; *see also Heart of Am. Nw. v. Westinghouse Hanford Co.*, 820 F. Supp. 1265, 1279

authority in the Order, since NPL sites presumably deserve greater attention at the highest levels of government. That reading is supported by Section 2(e)(2) of the Order, which reads similarly to Section 2(e)(1), except that it makes no reference to whether the federal facility is listed on the NPL. *See id.* at 2924-25. The Order contemplates that § 104 included authority to act with respect to federal facilities, both NPL and non-NPL.

(E.D. Wash. 1993) (holding that an environmental cleanup at a federal facility listed on the NPL was conducted under § 104, not § 120).[24]

Section 120 does create unnecessary tension with a logical reading of § 104, but, as we have indicated on numerous occasions, CERCLA is not the Mona Lisa of statutes. *United States v. Rohm & Hass Co.*, 2 F.3d 1265, 1270 n.6 (3d Cir. 1993) ("Numerous courts have complained about the inartful, confusing, and ambiguous language and the absence of useful legislative history [of CERCLA]."), *overruled on other grounds by United States v. E.I. DuPont de Nemours & Co.*, 432 F.3d 161 (3d Cir. 2005) (en banc); *Lansford-Coaldale Water Auth. v. Tonolli Corp.*, 4 F.3d 1209, 1221 (3d Cir. 1993) ("CERCLA … [is] notorious for its lack of clarity and poor draftsmanship[.]"); *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 n.5 (3d Cir. 1992) ("[T]he statute is riddled with inconsistencies and redundancies."). The tension is not so great as to warrant interpreting the statutory scheme in a manner that contravenes the likely intent of Congress. Adopting the Palmers' interpretation of CERCLA would lead to the odd result that litigants could not challenge ongoing cleanup work at private

---

[24] We recognize, however, that not every court agrees with that conclusion. In *Fort Ord Toxics Project, Inc. v. California E.P.A.*, the Ninth Circuit held that, while "troubling[,]" it is "most reasonable" to interpret §§ 104 and 120 as separate grants of authority. 189 F.3d 828, 832 (9th Cir. 1999). We are not persuaded by that interpretation, and it is notable that no other circuit court has adopted *Ford Ord*'s reasoning.

facilities but they could run rampant with challenges to the same at federal Superfund sites.

We therefore agree with the District Court that the EPA's cleanup efforts at the Naval Facilities have been undertaken pursuant to § 104, subject to the requirements of § 120.[25]

### B.      Sovereign Immunity

The Navy argues that even if the Giovannis' and Palmers' claims are not barred as challenges to ongoing response actions that they must nevertheless fail because of the government's sovereign immunity. "As a sovereign, the United States is immune from suit unless it consents to be sued." *White-Squire v. U.S. Postal Serv.*, 592 F.3d 453, 456 (3d Cir. 2010). "Its consent to be sued must be 'unequivocally expressed,' and the terms of such consent define the court's subject matter jurisdiction." *Id.* (quoting

---

[25] The parties dispute whether the District Court was required to remand the claims to state court. Because we have concluded that § 113(h) does not bar the medical monitoring claims, there is federal jurisdiction over those claims and remand to state court is unnecessary. Section 113(h) did not bar filing those claims initially in state court. Nor did § 113(b), because the claims arise under state law, not CERCLA. We will, however, affirm the District Court's decision to dismiss the demands for a health effects study because those demands constitute challenges to the Navy's ongoing cleanup, and thus neither we nor the state courts have jurisdiction to consider those claims at this time.

*United States v. Mitchell*, 445 U.S. 535, 538 (1980)).
Importantly, even when there is a statutory waiver of
immunity, "[w]e should not take it upon ourselves to extend
the waiver beyond that which Congress intended." *Id.*
(quoting *United States v. Kubrick*, 444 U.S. 111, 117-18
(1979)). The Giovannis and Palmers contend that the Navy,
as an agency of the United States, has waived its sovereign
immunity pursuant to § 6001(a) of RCRA and pursuant to
§ 120(a)(1) of CERCLA. The Navy disagrees, and argues
that there is no unequivocal waiver of its sovereign immunity.
We think the Giovannis and Palmers have the better of the
argument because § 6001(a) of RCRA unequivocally waives
sovereign immunity to state law claims for injunctive relief.[26]

---

[26] The Navy did not, however, waive its sovereign
immunity under § 120(a)(1) of CERCLA. That provision
states that "[e]ach department, agency, and instrumentality of
the United States … shall be subject to, and comply with,
[CERCLA] in the same manner and to the same extent, both
procedurally and substantively, as any nongovernmental
entity[.]" 42 U.S.C. § 9620(a)(1). Another subsection,
however, says that "[s]tate laws concerning removal and
remedial action, including State laws regarding enforcement,
shall apply to removal and remedial action at facilities owned
or operated by a department, agency, or instrumentality of the
United States or facilities that are the subject of a deferral
under subsection (h)(3)(C) of this section *when such facilities
are not included on the National Priorities List*." *Id.*
§ 9620(a)(4) (emphasis added). The Naval Facilities are
listed on the NPL, and thus the federal government has not
exposed itself to liability under state law as it relates to its
response efforts at those sites. *See Warminster Twp. Mun.
Auth. v. United States*, 903 F. Supp. 847, 850 (E.D. Pa. 1995)

Section 6001(a) of RCRA provides that each department or agency of the federal government dealing with solid or hazardous wastes "shall be subject to, and comply with, all Federal, State, interstate, and local requirements, both substantive and procedural[.]"  It goes on to state that "[t]he Federal, State, interstate, and local substantive and procedure requirements referred to in this subsection include, but are not limited to, all administrative orders and all civil and administrative penalties and fines[.]"  42 U.S.C. § 6961(a).  Moreover, it provides that "[t]he United States hereby expressly waives any immunity otherwise applicable to the United States with respect to any substantive or procedural requirement (including, but not limited to, any injunctive relief, administrative order or civil or administrative penalty or fine …)." *Id.*  That waiver is wordy but the upshot is that the United States has surrendered its immunity with respect to the enforcement of federal, state, and local environmental laws due to contamination at the hands of the government, when such enforcement involves injunctive relief. *Id.*  The RCRA waiver does not, however, suggest that the government has waived its sovereign immunity for suits by private parties for money damages. The question thus becomes whether a medical monitoring claim is more appropriately classified as a request for money damages or for injunctive relief.

The Giovannis and Palmers characterize their requested relief as an injunction ordering the Navy to fund a trust fund that will pay for private party medical monitoring.

("[T]he waiver of sovereign immunity described in CERCLA cannot operate to expose the Government to liability under the HSCA [for facilities on the NPL].").

That led the District Court to logically concluded that the Giovannis and Palmers lawsuits sought "injunctive relief to compel medical monitoring[.]" (G.J.A. at 112.) Although the case law on that issue is less than clear, we think the better approach on this record is to classify the relief as injunctive.

The characterization of medical monitoring appears to come up most often in mass exposure cases where putative class plaintiffs seek certification of an injunctive relief class under Federal Rule of Civil Procedure 23(b)(2). *See, e.g.*, *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 264 (3d Cir. 2011) (addressing putative Rule 23(b)(2) class seeking costs for medical monitoring); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 142 (3d Cir. 1998) (same). In that context, we have acknowledged that "[m]edical monitoring cannot be easily categorized as injunctive or monetary relief," *Gates*, 655 F.3d at 262, but have not squarely resolved the issue, *see, e.g., id.* at 263 (declining to reach issue because the district court denied class certification "for reasons unrelated to the injunctive or monetary nature of the relief sought"). *See also Barnes*, 161 F.3d at 151 (recognizing that medical monitoring claims can be brought "at law or in equity depending on the type of relief sought").

We have also said that "[i]f plaintiffs seek relief that is a disguised request for compensatory damages, then the medical monitoring claim can only be characterized as a claim for monetary damages." *Id.* (quoting *Arch v. Am. Tobacco Co., Inc.*, 175 F.R.D. 469, 483 (E.D. Pa. 1997)). "A plaintiff cannot transform a claim for damages into an equitable action by asking for an injunction that orders the payment of money." *Jaffee v. United States*, 592 F.2d 712, 715 (3d Cir. 1979). On the other hand, "if plaintiffs seek the

establishment of a court-supervised medical monitoring program through which the class members will receive periodic medical examinations, then plaintiffs' medical monitoring claims can properly be characterized as a claim seeking injunctive relief." *Barnes*, 161 F.3d at 151 (quoting *Arch*, 175 F.R.D. at 483). Under those circumstances, "the creation of [an] expense does not necessarily remove a form of relief from the category of equitable remedies." *Jaffee*, 592 F.2d at 715. Therefore, whether a medical monitoring claim is a request for a legal remedy or one for equitable relief requires a case-specific analysis.

Here, we are faced with a request for medical monitoring under HSCA. We have noted that, in *Redland Soccer Club, Inc. v. Department of the Army*, "[t]he Pennsylvania Supreme Court has endorsed awarding medical monitoring damages as a trust fund which 'compensates the plaintiff for only the monitoring costs actually incurred.'" *Gates*, 655 F.3d at 263 (quoting *Redland Soccer*, 696 A.2d 137, 142 (Pa. 1997)). That Court expressly recognized the availability of medical monitoring relief in a claim under HSCA. 696 A.2d at 142. It characterized the plaintiffs in that case as having "requested equitable relief ... in the form of a medical monitoring trust fund[.]" *Id*. It then explained that the relief available for such a claim was the creation of a trust fund through its equitable powers, not a lump sum award of damages:

> A claim for a medical monitoring trust fund is significantly different from a claim for a lump sum award of damages. A trust fund compensates the plaintiff for only the monitoring costs actually incurred. In contrast,

> a lump sum award of damages is exactly that, a monetary award that the plaintiff can spend as he or she sees fit. Various courts have advocated the trust fund approach instead of the lump sum approach.

*Id.* at 142 n.6 (citations omitted).

That case is not the only one in which a state high court concluded that the type of medical monitoring costs sought here is best characterized as injunctive relief. The New Jersey and Maryland Supreme Courts also agree. *See Exxon Mobil Corp. v. Albright*, 71 A.3d 30, 80 (Md. 2013) ("We note with approval the recent tendency of many courts that award medical monitoring costs to do so by establishing equitably a court-supervised fund, administered by a trustee, at the expense of the defendant."); *Ayers v. Township of Jackson*, 525 A.2d 287, 314 (N.J. 1987) ("In our view, the use of a court-supervised fund to administer medical-surveillance payments in mass exposure cases … is a highly appropriate exercise of the Court's equitable powers.").

The United States Supreme Court likewise appears to agree that a medical monitoring claim can be something other than a claim for money damages. In *Metro-North Commuter Railroad Company v. Buckley*, 521 U.S. 424 (1997), a railroad worker had brought suit under the Federal Employers' Liability Act (FELA) as a result of asbestos exposure. *Id.* at 427. The worker, who was asymptomatic, had sought a lump-sum damages award for negligent infliction of emotional distress and for a related medical monitoring claim. *Id.* at 426-27. The district court dismissed the FELA claim because the worker had not shown evidence

of actual physical harm, and the court declined to address the medical monitoring claim. *Id.* at 428. The Second Circuit reversed, permitting the medical monitoring claim to proceed. *Id.* at 438-39. The Supreme Court granted certiorari and in turn reversed the Second Circuit.

The Supreme Court interpreted the Second Circuit's opinion as adopting the idea "that medical monitoring costs themselves represent a separate negligently caused economic 'injury[]' … permitting (as tort law ordinarily permits) the recovery of medical cost damages in the form of a lump sum[.]" *Id.* at 439. With no FELA case law on point, the Supreme Court "canvassed the state-law cases that have considered whether the negligent causation of this kind of harm (*i.e.*, causing a plaintiff, through negligent exposure to a toxic substance, to incur medical monitoring costs) by itself constitutes a sufficient basis for a tort recovery." *Id.* at 440. The Court described that body of law as revealing "that the cases authorizing recovery for medical monitoring in the absence of physical injury do not endorse a full-blown, traditional tort law case of action for lump-sum damages[.]" *Id.* "Rather," the Court observed, "those courts, while recognizing that medical monitoring costs can amount to a harm that justifies a tort remedy, have suggested, or imposed, special limitations on that remedy." *Id.* at 440-41. The Court explained that the New Jersey Supreme Court had "recommend[ed] in future cases [the] creation of 'a court-supervised fund to administer medical-surveillance payments[.]'" *Id.* at 441 (quoting *Ayers*, 525 A.3d at 314). The Supreme Court characterized the Second Circuit's adoption of a lump-sum damages award for medical monitoring costs as "beyond the bounds of currently evolving

54

common law." *Id.* at 440 (internal quotation marks and citation omitted).

As it relates to the Giovannis' and Palmers' medical monitoring claims under HSCA, we now join those courts that have characterized that type of relief as primarily equitable in nature. The Giovannis' and Palmers' medical monitoring claims do not seek a lump sum of money to compensate them for past harm. Rather, those claims seek an order requiring the Navy to fund a trust that will cover a prospective private party medical monitoring program. That the Navy will have to expend money does not, in itself, make the desired relief a demand for money damages. *Jaffee*, 592 F.2d at 715. We therefore conclude that the Giovannis' and Palmers' medical monitoring claims are best understood as requests for injunctive relief.[27]

Because RCRA waives sovereign immunity to claims for injunctive relief, the Navy is not immune from suit for the costs of private party medical monitoring. Accordingly, those claims may proceed.

## IV. CONCLUSION

For the foregoing reasons, we will affirm in part and vacate and remand in part the orders of dismissal.

---

[27] Our analysis is limited to characterizing claims for private party medical monitoring under HSCA for purposes of the RCRA waiver of sovereign immunity. We do not decide today how to characterize claims for relief outside those limited circumstances.

BIBAS, *Circuit Judge*, concurring in part and concurring in the judgment.

I agree with the majority that the government took its response actions at Navy facilities under §9604, so I join part III.A.4 of the majority opinion. I also join part III.B because I agree with the limited holding that RCRA's sovereign-immunity waiver does not bar claims that seek a medical-monitoring trust fund. *See* Maj. Op. at 55 n.27. So I concur in the judgment.

But I would adopt the D.C. Circuit's definition of a forbidden "challenge," limiting it to actions that would interfere with a cleanup. At root, I disagree that *who* does an action bears on whether that *action* meets CERCLA's definitions of "removal" or "remedial." In other words, I am unpersuaded by the Ninth Circuit's decision in *Hanford*. While that opinion relies on legislative history and remedial purpose, I would stick to the statutory text. At the very least, we should adopt a single workable test to determine what are challenges barred by §9613(h).

Under the correct test, neither medical monitoring nor health assessments qualify as "challenges to removal or remedial action[s]." 42 U.S.C. §9613(h). I agree with the majority that private medical monitoring is not a challenge. But my conclusion would not change if the plaintiffs sought medical monitoring by the government. The same is true for health assessments.

## I. WE SHOULD ADOPT THE D.C. CIRCUIT'S INTERFERENCE TEST

To determine what a forbidden "challenge" is, the majority takes a "holistic approach." Maj. Op. at 20. It addresses each

1

of our sister circuits' varied tests and applies them all. But adopting divergent tests leaves district courts without a workable framework. Instead, we should distill the various tests into a single one. The D.C. Circuit has already done that work for us in *El Paso Natural Gas*, 750 F.3d at 880.

Adopting the other circuits' differing tests could produce divergent results. This case illustrates the point. The Giovannis' and Palmers' health-assessment claims are unlikely to call the remedial plan "into question." *Broward*, 311 F.3d at 1073. And arguably it would not "interfere with the implementation of a CERCLA remedy" by "'impact[ing] the [removal] action selected.'" *Cannon*, 538 F.3d at 1335 (quoting *Broward*, 311 F.3d at 1072). At most, health assessments could later prompt the EPA to take extra response actions if the health assessment revealed a significant risk. 42 U.S.C. § 9604(i)(11). But layering new health measures, or even extra cleanup efforts, on top of an existing plan is not the same as challenging the measures already selected. On the other hand, a health assessment is "related to the goals of cleanup." *Razore*, 66 F.3d at 239. Still, the majority relies on all three of those opinions, plus *El Paso*. Maj. Op. at 16-17. I do not know how district courts will untangle this web.

Instead, I would adopt *El Paso*'s interference test. The D.C. Circuit nicely synthesized our sister circuits' varied tests into a single framework: a claim is a challenge under § 9613(h) "if it will *interfere* with a 'removal' or a 'remedial action.'" *El Paso*, 750 F.3d at 880 (emphasis in original) (discussing *Cannon* and *Broward*, among other cases). In close cases, courts must gauge how closely "the suit [relates to] the CERCLA cleanup:

2

the more closely related, the clearer it will be that the suit is a 'challenge.'" *Id.* And the Ninth, Tenth, and D.C. Circuits agree that the statutory requirement of a "challenge" means "interference" or something very close to it. *El Paso*, 750 F.3d at 880; *Cannon*, 538 F.3d at 1335; *see also Razore*, 66 F.3d at 239-40 (finding "interfere[nce]" because the requested remedies could have "halted [cleanup efforts] for 'days or weeks'"). I would simply add that "interfere" should carry its ordinary meaning: to "obstruct[ ] or hind[er]." *Interference*, *Black's Law Dictionary* 831 (8th ed. 2004).

## II. MEDICAL MONITORING IS NOT A RESPONSE ACTION

The majority artfully explains why private medical monitoring is neither a removal nor a remedial action. But I see no reason why the quality of the *action* changes simply because the *actor* is the government.

The Ninth Circuit's opinion in *Hanford*, relied on by the majority, is unpersuasive. Maj. Op. at 27-29. There, the Ninth Circuit resorted too quickly to CERCLA's legislative history and remedial purpose. 71 F.3d at 1478-81. But CERCLA does not distinguish governmental actors from private ones; the relevant provisions say nothing about who does the cleanup. As the majority notes, the law "gives 'the President broad power to command government agencies and private parties to clean up hazardous waste sites.'" Maj. Op. at 14 (quoting *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994)). And the definitions of "removal" and "remedial action[s]" are keyed to actions, not actors. 42 U.S.C. §9601(23) (listing "*actions*" that may need to be taken to "cleanup or remov[e] released hazard-

ous substances") (emphasis added); *id.* § 9601(24) ("[R]emedial *action* means those *actions* consistent with permanent remedy taken instead of or in addition to removal *actions*.") (internal quotation marks omitted and emphases added).

Given the statutory text's explicit focus on actions, not actors, I find *Hanford*'s focus on legislative history and purpose unpersuasive. So I would hold that § 9613(h) does not bar a suit seeking medical monitoring as "challenges to removal or remedial action."

### III.  Nor Are Health Assessments Response Actions

Nor does government involvement turn health assessments into removal or remedial actions. CERCLA explicitly distinguishes health assessments from response actions. The statute allows recovery of

> (A) all costs of *removal or remedial action* incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

> (B) any other necessary *costs of response* incurred by any other person consistent with the national contingency plan;

> (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; *and*

4

> (D) the costs of *any health assessment or health effects study* carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a)(4) (emphases added). Since the statute enumerates response actions separately from health assessments, the two are distinct. Any other reading renders § 9607(a)(4)(D) superfluous.

And subparagraph (D) was added later than (A) and (B). Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499, § 107, 100 Stat. 1613. In fact, Congress added subparagraph (D) at the same time that it created the ATSDR and provided for medical monitoring and health assessments. *Id.* §§ 107, 110. If health assessments were removal or remedial actions, then they would already have been covered by § 9607(a)(4)(A) and (B). But health assessments were not, so Congress added § 9607(a)(4)(D). I would give full effect to that addition.

True, there is a colorable argument that the definition of a health assessment falls within the definition of a removal action. Health assessments examine "the potential risk to human health posed by individual sites and facilities." 42 U.S.C. § 9604(i)(6)(F). That sounds a lot like "assess[ing], and evaluat[ing] the release" of, hazardous substances. *Id.* § 9601(23) (defining removal actions). Still, health assessments are unlike the other temporary measures listed in the definition of removal actions, like providing security fencing or monitoring the release of hazardous substances. They are not done at the cleanup site itself. And the enumeration of health assessments as distinct from removal actions in § 9607(a)(4) resolves any

5

doubt. So I would hold that health assessments are neither removal nor remedial actions.

Nor would a health assessment interfere with any response action. On this record, I do not see how a health assessment would obstruct or hinder any ongoing cleanup. Sure, it might require the EPA to take more action if the assessment revealed a significant risk. *Id.* §9604(i)(11). And those extra actions might include "provi[ding] alternative water supplies, temporary evacuation and housing," all of which are listed removal actions. *Id.* §9604(23). But a health assessment is upstream from a response action. We lack jurisdiction over challenges to response actions only if they have been "selected." *Id.* §9613(h). But while an assessment may require new response actions, it is not an attack on the response itself.

\* \* \* \* \*

In short, §9613(h) turns on whether the *action* would interfere with a removal or remedial action, not whether the *actor* is the government. Neither medical monitoring nor health assessments would interfere with an ongoing cleanup. So I would hold that neither kind of requested relief turns a suit into a challenge.

I agree with the majority that the court-supervised medical monitoring sought here is not a challenge and is not barred by sovereign immunity, so I concur in part and in the judgment. Because the majority finds that government-led health assessments are challenges barred by §9613(h), it does not address whether sovereign immunity would bar those claims. So I too decline to reach that question.

6